1  Russell L. Hirschhorn (*pro hac vice* pending)
   rhirschhorn@proskauer.com
2  Myron D. Rumeld (*pro hac vice* pending)
   mrumeld@proskauer.com
3  PROSKAUER ROSE LLP
   Eleven Times Square
4  New York, NY 10036-8299
   Telephone:     (212) 969-3000
5  Facsimile:     (212) 969-2900

6  John E. Roberts (*pro hac vice* pending)
   jroberts@proskauer.com
7  Adam L. Deming (*pro hac vice* pending)
   ademing@proskauer.com
8  PROSKAUER ROSE LLP
   One International Place
9  Boston, MA 02110-2600
   Telephone:     (617) 526-9600
10 Facsimile:     (617) 526-9899

11 Philippe A. Lebel, SBN 274032
   plebel@proskauer.com
12 PROSKAUER ROSE LLP
   2029 Century Park East, Suite 2400
13 Los Angeles, CA 90067
   Telephone:     (310) 557-2900
14 Facsimile:     (310) 557-2193

15 *Counsels for Amici Curiae*

16                 **IN THE UNITED STATES DISTRICT COURT**
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
17                          **SAN JOSE DIVISION**

18

19 ROBERT BRACALENTE and BORIS                Case No. 5:22-cv-04417-EJD
   GDALEVICH, individually and as representatives
20 of a class of similarly situated persons, on behalf of   **AMICI CURIAE BRIEF OF**
   the CISCO SYSTEMS, INC. 401(K) PLAN,      **AMERICAN BENEFITS COUNCIL,**
                                              **ERISA INDUSTRY COMMITTEE,**
21                 Plaintiffs,                **AMERICAN RETIREMENT**
                                              **ASSOCIATION, AND COMMITTEE**
22           v.                               **ON INVESTMENT OF EMPLOYEE**
                                              **BENEFIT ASSETS, INC.**
23 CISCO SYSTEMS, INC.; THE BOARD OF
   TRUSTEES OF CISCO SYSTEMS, INC.; THE
24 ADMINISTRATIVE COMMITTEE OF THE           Date:   March 23, 2023
   CISCO SYSTEMS, INC. 401(K) PLAN; and      Time:   9:00 A.M.
25 DOES No. 1-20, Whose Names Are Currently   Place:  Courtroom 4, 5th Floor
   Unknown,
26
                  Defendants.
27

28

                                                          No. 5:22-cv-04417

1

## **TABLE OF CONTENTS**

2
**Page**

3    INTEREST OF AMICI CURIAE ................................................................................1

4    INTRODUCTION ....................................................................................................2

5    ARGUMENT ...........................................................................................................5

6    I.    DUDENHOEFFER PROVIDES THE APPLICABLE PLEADING STANDARD FOR
             IMPRUDENCE CLAIMS RELATED TO PLAN INVESTMENTS................................5

7          A.    ERISA's Duty of Prudence Provides a Flexible Standard ......................5

8          B.    Retirement Plan Sponsors and Fiduciaries Face a Flood of Litigation...................7

9          C.    The Supreme Court Set a High Bar for Pleading Imprudence..............8

10   II.   PLEADING FUND UNDERPERFORMANCE IS INSUFFICIENT TO SATISFY THE
             DUDENHOEFFER STANDARD .................................................................10

11         A.    Fund Underperformance Does Not Indicate an Imprudent Process .....................11

12         B.    Underperformance Claims Adopt a Superficial Understanding of Performance
                   That Fails to Meet the Dudenhoeffer Standard. ..................................14

13   III.  ALLOWING PLAINTIFFS' CLAIMS TO GO FORWARD WILL HAVE FAR-
             REACHING NEGATIVE CONSEQUENCES FOR PLAN SPONSORS, FIDUCIARIES,

14           AND PARTICIPANTS ......................................................................................18

15   CONCLUSION........................................................................................................21

16

17

18

19

20

21

22

23

24

25

26

27

28

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE
AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE
BENEFIT ASSETS INC.

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abel v. CMFG Life Ins. Co.*,
No. 3:22-cv-00449-wmc (W.D. Wis. filed Aug. 19, 2022) ......................................7

*Albert v. Oshkosh Corp.*,
47 F.4th 570, 2022 U.S. App. LEXIS 24300 (7th Cir. Aug. 29, 2022) ................10

*Amgen Inc. v. Harris*,
577 U.S. 308 (2016) (*per curiam*) ........................................................................9

*Anderson v. Advance Publ'ns, Inc.*,
No. 1:22-cv-06826-AT (S.D.N.Y. filed Aug. 10, 2022)........................................7

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
579 F. Supp. 3d 1133 (N.D. Cal. 2022) ..........................................................13, 15

*Antoine et al. v. Marsh & McLennan Cos. Inc. et al.*,
No. 1:22-cv-06637-JPC (S.D.N.Y. filed Aug. 4, 2022)........................................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................4, 9

*Beldock et al. v. Microsoft Corp. et al.*,
No. 2:22-cv-01082-JLR (W.D. Wash. filed Aug. 2, 2022) ..................................7

*Bracalente et al. v. Cisco Sys., Inc. et al.*,
No. 5:22-cv-04417-VKD (N.D. Cal. filed July 29, 2022) ....................................7

*DeBruyne v. Equitable Life Assurance Soc'y of U.S.*,
920 F.2d 457 (7th Cir. 1990) ................................................................................6

*DiFelice v. U.S. Airways, Inc.*,
497 F.3d 410 (4th Cir. 2007) ................................................................................6

*Donovan v. Mazzola*,
716 F.2d 1226 (9th Cir. 1983) ..............................................................................6

*Evans v. Associated Banc-Corp*,
2022 U.S. Dist. LEXIS 178430 (E.D. Wisc. Sept. 30, 2022) ..............................10

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)........................................................................................4, 8, 9

*Gonzalez v. Northwell Health, Inc.*,
2022 U.S. Dist. LEXIS 180110 (E.D.N.Y. Sept. 30, 2022)..................................10

*Hall et al. v. Cap. One Fin. Corp. et al.*,
No. 1:22-cv-00857-PTG-JFA (E.D. Va. filed Aug. 1, 2022) ...............................7

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE BENEFIT ASSETS INC.

*Hughes v. Northwestern University*,
    142 S. Ct. 737 (2022) ..................................................................9, 10, 11, 20

*Kistler et al. v. Stanley Black & Decker Inc. et al.*,
    No. 3:22-cv-00966-KAD (D. Conn. filed July 29, 2022) ...........................................7

*Luckett v. Wintrust Fin. Corp. et al.*,
    No. 1:22-cv-03968 (N.D. Ill. filed July 29, 2022) ..................................................7

*Meiners v. Wells Fargo & Co.*,
    898 F.3d 820 (8th Cir. 2018) ..................................................................10, 17

*Motz et al. v. Citigroup Inc. et al.*,
    No. 3:22-cv-00965-RNC (D. Conn. filed July 29, 2022) ...........................................7

*Rinehart v. Lehman Bros. Holdings Inc.*,
    817 F.3d 56 (2d Cir. 2016) ....................................................................6, 16

*Smith v. CommonSpirit Health*,
    37 F.4th 1160 (6th Cir. 2022) ..............................................................10, 12, 13

*Trauernicht et al. v. Genworth Fin. Inc., et al.*,
    No. 3:22-cv-00532-REP (E.D. Va. filed Aug. 1, 2022).............................................7

*Tullgren v. Booz Allen Hamilton Inc. et al.*,
    No. 1:22-cv-00856-MSN-IDD (E.D. Va. filed Aug. 1, 2022) ......................................7

*Wehner v. Genentech, Inc.*,
    2021 U.S. Dist. LEXIS 26227 (N.D. Cal. Feb. 9, 2021) ...........................................10

**STATUTES & RULES**

29 U.S.C. § 1001(a) ...............................................................................20

Fed. R. Civ. Proc. 8.................................................................................4

**OTHER AUTHORITIES**

Austin R. Ramsey,
    *BlackRock 401(k) Investment Suits Send Message 'Nobody's Safe,'*, Bloomberg Law (Aug.
    10, 2022), *available at* https://news.bloomberglaw.com/daily-labor-report/blackrock-401k-
    investment-suits-send-message-nobodys-safe .....................................................19

Austin R. Ramsey,
    *Excessive Retirement Fees Suits Jump-Start Pooled-Plan Activity*, Bloomberg Law (May 24,
    2022), *available at* https://news. bloomberglaw.com/daily-labor-report/excessive-retirement-
    fees-suits-jump-start-pooled-plan-activity ............................................................7

Brian Anderson,
    *The Dramatic Rise in Excessive 401k Fee Litigation—and Who's Fighting It*, 401k Specialist,
    *available at* https://401kspecialistmag.com/the-dramatic-rise-in-excessive-401k-fee-
    litigationand-whos-fighting-it/; AIG, *Understanding the Rapid Rise in Excessive Fee Claims*
    4 (2021) ("Understanding Excessive Fee Claims"), *available at*
    https://www.aig.com/content/dam/aig/america-canada/us/documents/business/management-
    liability/pension-trustee-excess-fees-fiduciary-whitepaper.pdf..........................................7, 18

Elizabeth Bauer,
*Fact Check: Were 401(k)s Really an 'Accident of History'?*, Forbes (Mar. 7, 2020), *available at* https://www.forbes.com/sites/ ebauer/2020/03/07/fact-check-were-401ks-really-an-accident-of-history/?sh=7677a0356110...................................................................20

George S. Mellman & Geoffrey T. Sanzenbacher,
*401(k) Lawsuits: What Are the Causes and Consequences?*, Center for Retirement Research at Boston College No. 18-8 (May 2018), *available at* https://crr.bc.edu/wp-content/uploads/ 2018/04/IB_18-8.pdf (tracking suits against administrators of 401(k) plans from 2006 to 2017) .............................................................................................................................7

Jacklyn Wille,
*Spike in 401(k) Lawsuits Scrambles Fiduciary Insurance Market*, Bloomberg Law (Oct. 18, 2021), *available at* https://news.bloomberglaw.com/ employee-benefits/spike-in-401k-lawsuits-scrambles-fiduciary-insurance-market ....................................................................18

Jeff Reeves,
*Bull Market Definition*, U.S. News & World Report (Mar. 2, 2022), *available at* https://money.usnews.com/investing/term/bull-market..........................................16

John Manganaro,
*More TDF Underperformance ERISA Lawsuits Filed*, Plan Adviser (Aug. 15, 2022), *available at* https://www.planadviser.com/tdf-underperformance-erisa-lawsuits-filed/ .........11

John Rosevear, *What You Need to Know About Active vs. Passive Investing*, The Motley Fool (Jul. 5, 2022) (explaining differences in fees and risk profile of active versus passive management), *available at* https://www.fool.com/investing/how-to-invest/active-vs-passive-investing/..........................................................................................................................13

Megan Pacholok & Karen Zaya,
*2022 Target-Date Strategy Landscape*, Morningstar at 38 (Mar. 23, 2022) ("TDF Landscape Report"), *available at* https://www.morningstar.com/lp/tdf-landscape....................................13

Nevin E. Adams, JD,
*ADP MEP Tapped in Excessive Fee Suit*, Nat'l Assoc. of Plan Advisors (May 5, 2020), *available at* https://www.napa-net.org/news-info/daily-news/adp-mep-tapped-excessive-fee-suit...............................................................................................................................12

Nevin E. Adams, JD,
*Gucci Plaintiffs Bag Settlement in Excessive Fee Suit*, Nat'l Assoc. of Plan Advisors (June 25, 2019), *available at* https://www.napa-net.org/news-info/daily-news/gucci-plaintiffs-bag-settlement-excessive-fee-suit ......................................................................................12

Nevin E. Adams, JD,
*Law Firm Files Another Excessive Fee Suit Targeting TDFs*, Nat'l Assoc. of Plan Advisors (July 8, 2020), *available at* https://www.napa-net.org/news-info/daily-news/law-firm-files-another-excessive-fee-suit-targeting-tdfs........................................................................12

Nevin E. Adams, JD,
*Two Excessive Fee Suits Settled*, Nat'l Assoc. of Plan Advisors (Apr. 25, 2019), *available at* https://www.napa-net.org/news-info/daily-news/two-excessive-fee-suits-settled .................12

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE BENEFIT ASSETS INC.

Sachin Nagarajan,
*What is the Morningstar Analyst Rating™ for funds?*, Morningstar (Sept. 22, 2021),
*available at* https://www.morningstar.com/investing-definitions/morningstar-analyst-rating-
for-funds ..................................................................................................................14

Sarah Holden, et al.,
*The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, 27 ICI
Research Perspective (June 2021), *available at*  https://www.ici.org/system/files /2021-
06/per27-06.pdf ........................................................................................................6

Society for Human Resources Management,
*Designing and Administering Defined Contribution Retirement Plans*, *available at*
https://www.shrm.org/resourcesandtools/tools-and-samples/toolkits/pages/
designingandadministeringdefinedcontributionretirementplans.aspx ......................................6

U.S. Dep't of Labor & U.S. Bureau of Labor Statistics,
*National Compensation Survey: Employee Benefits in the United States, March 2022* (Sept.
2022), *available at* https://www.bls.gov/ncs/ebs/benefits/2022/home.htm ..............................5

U.S. Dep't of Labor,
*Fact Sheet: What is ERISA*, *available at* https://www.dol.gov/ agencies/ebsa/about-ebsa/our-
activities/resource-center/fact-sheets/what-is-erisa ..................................................................5

U.S. Dep't of Labor,
*FAQs about Retirement Plans and ERISA* at 11–12, *available at*
https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-
center/faqs/retirement-plans-and-erisa-for-workers.pdf ..........................................................6

Understanding Excessive Fee Claims at 2 (2021), *available at* https://www.aig.com/
content/dam/aig/america-canada/us/documents/business/management-liability/pension-
trustee-excess-fees-fiduciary-whitepaper.pdf ..........................................................................8

No. 5:22-cv-04417

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE
AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE
BENEFIT ASSETS INC.

**INTEREST OF AMICI CURIAE**

This brief is submitted on behalf of proposed *amici* American Benefits Council, the ERISA Industry Committee, American Retirement Association, and Committee on Investment of Employee Benefit Assets Inc. in support of the Defendants.[*]

The American Benefits Council (the Council) is a national non-profit organization dedicated to protecting and fostering employer-sponsored benefit plans. The Council's members are primarily large, multistate U.S. employers that sponsor benefit plans for active and retired workers and their families.  The Council's membership also includes organizations that offer services to benefit plans of all sizes.  Collectively, the Council's approximately 430 members directly sponsor or provide services to plans covering virtually every American who participates in an employer-sponsored benefit program.

The ERISA Industry Committee ("ERIC") is a national nonprofit organization exclusively representing large employers in the United States in their capacity as sponsors of employee benefit plans for their nationwide workforces.  ERIC's member companies voluntarily provide benefits, through plans governed by Employee Retirement Income Security Act of 1974 (ERISA), that cover millions of active and retired workers and their families across the country.  With member companies that are leaders in every sector of the economy, ERIC is the voice of large employer plan sponsors on federal, state, and local public policies impacting their ability to sponsor benefit plans and to lawfully operate under ERISA's protection from a patchwork of different and conflicting state and local laws in addition to federal law.  ERIC participates as *amicus curiae* in cases that have the potential for far-reaching effects on employee benefit plan design or administration, including cases relating to retirement plan investment options.

The American Retirement Association (ARA) is the coordinating entity for its five underlying affiliate organizations representing the full spectrum of America's private retirement

---

[*] This brief was principally authored by *amici* along with Proskauer Rose LLP, counsel for *amici*. No party's counsel authored this brief in whole or in part.  Neither any party nor any party's counsel contributed money related to the preparation or submission of this brief.  No person other than *amici*, their members, and their counsel contributed money related to the preparation or submission of this brief.

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE BENEFIT ASSETS INC.

system: the American Society of Pension Professionals and Actuaries; the National Association of Plan Advisors; the National Tax-Deferred Savings Association; the American Society of Enrolled Actuaries; and the Plan Sponsor Council of America.  ARA's members include organizations of all sizes and industries across the nation who sponsor and/or support retirement saving plans and are dedicated to expanding on the success of employer-sponsored plans.  In addition, ARA has more than 35,000 individual members who provide consulting and administrative services to American workers, savers, and the sponsors of retirement plans.  ARA's members are diverse but united in their common dedication to the success of America's private retirement system.

The Committee on Investment of Employee Benefit Assets Inc. (CIEBA) is a group of over 110 of the country's leading Chief Investment Officer Fiduciaries who collectively oversee over $2.6 trillion in assets, split almost evenly between defined benefit and defined contribution plans, plans which the employers of CIEBA members voluntarily offer as a highly valued benefit to their employee participants, who number approximately 17 million.  As such, CIEBA members are responsible for overseeing a substantial portion of the assets held in the private-sector retirement system and have a direct interest in its effective regulation.

The Council, ERIC, ARA, and CIEBA submit this brief to help the Court understand the practical importance of the pleading standard that applies to claims for fiduciary breach.  The fiduciaries of employee benefit plans have to continually make choices about the services and investments to offer plan participants.  Rarely do those decisions have a single right answer, and the considerations that fiduciaries must take into account are often in competition with each other.  For example, fiduciaries may have to balance the level and quality of service against cost as well as the risk of loss against the potential for return.  ERISA charges fiduciaries not with making the "right" decisions, but with reaching them prudently.

## INTRODUCTION

If it is allowed to proceed, the present lawsuit will put the fiduciaries of defined contribution plans across the country in a no-win situation.  In stark contrast to past imprudence suits, which have alleged that fiduciaries should have chosen lower fee *and* better performing investment fund

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE BENEFIT ASSETS INC.

alternatives, the Plaintiffs here claim imprudence *exclusively* based on the fiduciaries' selection of a BlackRock fund suite that allegedly underperformed—solely on short-term returns—a set of four cherry-picked so-called comparators with little in common with the challenged BlackRock funds beyond the "target date fund" label.

Plaintiffs' myopic fixation on a single variable among many that fiduciaries must consider in determining plan investment offerings creates a particularly menacing prototype for fiduciary strike suits, seeking a declaration that a fund suite is *per se* imprudent notwithstanding its fees, risk profile, or rating among market analysts—all of which the Complaint and its sources acknowledge are exemplary for the BlackRock fund suite here—among other factors.  Moreover, Plaintiffs fundamentally allege that it is imprudent to offer a fund that earned smaller returns for specified past periods than the top performers in the same broad fund category—here target date funds.  Any finding that this suffices to state a claim will subject every plan that does not select the #1 fund in each asset category to costly litigation, a catastrophic outcome for both the court system and the private retirement system.

Plaintiffs' theory is also badly out of sync with the law on fiduciary duties.  It is beyond dispute that if a fiduciary made annual decisions based solely on past performance, the fiduciary would breach his or her duty of prudence by ignoring the vast majority of other factors that must be considered, including risk tolerance, diversification, quality of management, and the nature of the covered workforce.  Indeed, if the Complaint (or any of its roughly one dozen identical copies filed simultaneously against other plan fiduciaries) survives a motion to dismiss, plan fiduciaries across the United States will be rendered vulnerable to suit for including any fund options that prioritize low management fees, risk mitigation, or any other factor a prudent fiduciary may consider over past returns.  Such an approach would also lead to disastrous fiscal results, with plan fiduciaries consistently buying high and selling low, all in the futile pursuit of past performance.  At bottom, Plaintiffs ask this Court to allow a suit to move forward based on a legal theory that would open the floodgates to lawsuits against every plan in the country and force the plans' fiduciaries to act in a way that is clearly contrary to law.

Nor are the vast majority of such claims likely to see an adjudication on the merits that might provide clarity as to how a fiduciary should balance fees, risk, and returns; instead, if history is any predictor, plaintiffs' counsel will simply use their surviving claims as a bargaining chip, leveraging the threat of costly discovery to secure settlements that generate a big payday for plaintiffs' firms but negligible benefits for plan participants.  Faced with mounting litigation and insurance costs and conflicting judicial guidance as to what types of imprudence allegations are sufficient to survive a motion to dismiss, smaller sponsors may simply decline to provide defined contribution plans at all.  For those that do, plan fiduciaries choosing investment options will be left to navigate between many competing interests with the threat of exorbitant litigation costs ever looming.

Nothing in the ERISA prudence case law compels this outcome.  Quite the opposite, in fact. In grappling with the surge of ERISA fiduciary breach cases over the past fifteen years, courts have recognized that they should not substitute their judgments for those of fiduciaries charged with making complex discretionary decisions.  Plan fiduciaries face an array of such decisions in structuring the menu of investment options available to plan participants, who may vary in widely their investment needs and objectives.  Because a range of reasonable considerations and choices exist, courts do not find fiduciary breaches simply because one fund choice underperformed a set of cherry-picked hypothetical alternatives on a single metric for a fixed period of time.  And this is doubly so where, as here, the BlackRock fund suite and the alleged comparators featured wholly different investment strategies that would, by design, be expected to perform differently under different market conditions.

Out of respect for the discretion of plan fiduciaries in making these difficult judgments, and consistent with the Supreme Court's decisions under ERISA and under Federal Rule of Civil Procedure 8, *see Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), courts have required complaints to set forth allegations that demonstrate an imprudent process—to plead facts showing that a reasonable process *could not have produced* the decisions the fiduciaries made.

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE BENEFIT ASSETS INC.

1    The pleading standard that Plaintiffs seek takes a different approach and would allow full-

2  blown class action litigation to launch merely based on a plaintiff's assertion that one factor—here,

3  short-term returns—should have taken precedence over the plethora of other factors a fiduciary must

4  consider in structuring a plan's investment options, including investment strategy, quality of fund

5  management, risk, and fees, among others.  That standard is out of step with ERISA and with the

6  realities of fiduciary decisionmaking and would constrain plan fiduciaries' ability to make the

7  decisions they believe would best serve the interests of their individual plans.  Plaintiffs' bid to

8  rewrite the pleading standard—and the chaos such a move would cause—must be rejected.

9                                    <u>**ARGUMENT**</u>

10  **I.    *DUDENHOEFFER* PROVIDES THE APPLICABLE PLEADING STANDARD FOR
        IMPRUDENCE CLAIMS RELATED TO PLAN INVESTMENTS**

11
        **A.    ERISA's Duty of Prudence Provides a Flexible Standard**

12

13    Employer-provided retirement plans form a cornerstone of the United States' retirement

14  system.  Approximately one-half of America's private industry workforce participates in an

15  employer-provided defined contribution plan,[1] and such plans number in the hundreds of thousands,

16  cover more than one hundred million employees, and include trillions of dollars in assets.[2]  The

17  Employee Retirement Income Security Act of 1974 (ERISA) governs these plans, safeguarding

18  them from mismanagement by requiring plan fiduciaries to exercise "the care, skill, prudence, and

19  diligence" of "a prudent man" "under the circumstances then prevailing."  Derived from the law of

20  trusts, ERISA's prudence standard rests on two bedrock principles.

21    First, the prudence inquiry focuses on the *process* a fiduciary uses, not the *results* that

22  process yields.  That is why ERISA § 404(a)(1) defines prudence by reference to "the circumstances

23  then prevailing" and employs the forward-looking concept of risk mitigation, rather than holding

24  fiduciaries accountable for the losses that are necessarily possible when investing in an

25

26  [1] U.S. Dep't of Labor & U.S. Bureau of Labor Statistics, *National Compensation Survey: Employee
    Benefits in the United States, March 2022* (Sept. 2022), *available at*

27  https://www.bls.gov/ncs/ebs/benefits/2022/home.htm.

28  [2] *See id.*; U.S. Dep't of Labor, *Fact Sheet: What is ERISA*, *available at* https://www.dol.gov/
    agencies/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/what-is-erisa.

1  unpredictable market.  Thus, it is an article of black letter law that "whether a fiduciary's actions are

2  prudent cannot be measured in hindsight, whether this hindsight would accrue to the fiduciary's

3  detriment or benefit."  *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007).[3]

4      Second and relatedly, the prudence standard leaves room for fiduciaries to exercise their

5  discretion to make choices appropriate for their particular plan and participants; it does not dictate

6  that fiduciaries choose one option over other prudent available options.  Plan fiduciaries are faced

7  with a panoply of considerations and options in structuring a plan.  They must consider the unique

8  needs of their participants and beneficiaries, who may vary in terms of their financial goals, level of

9  investment experience and engagement, and ability to use plan services and tools, among myriad

10  other factors.  Fiduciaries must likewise choose the administrative services their plans will use and

11  the range of plan investment options, including how many and which options to provide, how

12  menus of such options will be structured, whether fund options will be actively or passively

13  managed, what investment strategies funds will employ and what assets they will prioritize, and

14  what (if any) account services will be made available.[4]  All the while, fiduciaries must weigh each

15  of these choices in light of complex appraisals of associated costs, performance metrics, and

16  participant needs.  There is no single correct course for any of these decisions even among plans

17  with similar participant populations.  ERISA's prudence requirement thus dictates only that

18  fiduciaries employ a reasonable process in weighing competing options, not that they choose any

19  one option over others.

20  _____

21  [3] *See also Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 63–64 (2d Cir. 2016) (ERISA duty of prudence "requires prudence, not prescience") (citation omitted); *DeBruyne v. Equitable Life Assurance Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) (same) (citation omitted); *Donovan v.*

22  *Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983) (fiduciary's actions judged based on prudence "at the time they engaged in the challenged transactions").

23  [4] These variables are listed merely as a selection of those relevant to the present dispute; they barely scratch the surface of the full array of decisions a plan fiduciary must make in structuring an

24  employee retirement plan.  *See, e.g.*, U.S. Dep't of Labor, *FAQs about Retirement Plans and ERISA* at 11–12, *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-

25  activities/resource-center/faqs/retirement-plans-and-erisa-for-workers.pdf; Society for Human Resources Management, *Designing and Administering Defined Contribution Retirement Plans*,

26  *available at* https://www.shrm.org/resourcesandtools/tools-and-samples/toolkits/pages/ designingandadministeringdefinedcontributionretirementplans.aspx; Sarah Holden, et al., *The*

27  *Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, 27 ICI Research Perspective at 3–7 (June 2021), *available at*  https://www.ici.org/system/files /2021-06/per27-

28  06.pdf.

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE BENEFIT ASSETS INC.

## B. Retirement Plan Sponsors and Fiduciaries Face a Flood of Litigation

Notwithstanding the discretion built into ERISA's prudence requirement, plan sponsors and fiduciaries have been subject to a steadily growing tide of litigation alleging breaches in their duty of prudence over the past decade.[5]  In recent years, this tide has grown into a tsunami, with over 180 such federal suits being filed since 2020.[6]  More than half of United States district courts now have at least one such case pending, and the suits have expanded from pursuing large employer plans with over $1 billion in plan assets to targeting plans sponsored by smaller companies and non-profits, such as health systems and educational institutions.[7]

This proliferation of cases is fueled in large part by plaintiffs' firms' use of cookie-cutter complaints—i.e., copy-and-pasted complaints making identical allegations (in the same language and sometimes even featuring the same typos) against different plans—usually filed contemporaneously across many different districts.  The present case provides a ready example, as it is one of eleven identical cases filed by the same plaintiffs' firm in seven different district courts across the United States within days of one another.[8]

---

[5] *See* George S. Mellman & Geoffrey T. Sanzenbacher, *401(k) Lawsuits: What Are the Causes and Consequences?*, Center for Retirement Research at Boston College No. 18-8, at 2 (May 2018), *available at* https://crr.bc.edu/wp-content/uploads/ 2018/04/IB_18-8.pdf (tracking suits against administrators of 401(k) plans from 2006 to 2017).

[6] *See* Austin R. Ramsey, *Excessive Retirement Fees Suits Jump-Start Pooled-Plan Activity*, Bloomberg Law (May 24, 2022), *available at* https://news. bloomberglaw.com/daily-labor-report/excessive-retirement-fees-suits-jump-start-pooled-plan-activity.

[7] Brian Anderson, *The Dramatic Rise in Excessive 401k Fee Litigation—and Who's Fighting It*, 401k Specialist, *available at* https://401kspecialistmag.com/the-dramatic-rise-in-excessive-401k-fee-litigationand-whos-fighting-it/; AIG, *Understanding the Rapid Rise in Excessive Fee Claims* 4 (2021) ("Understanding Excessive Fee Claims"), *available at* https://www.aig.com/content/dam/aig/america-canada/us/documents/business/management-liability/pension-trustee-excess-fees-fiduciary-whitepaper.pdf.

[8] *See Motz et al. v. Citigroup Inc. et al.*, No. 3:22-cv-00965-RNC (D. Conn. filed July 29, 2022); *Luckett v. Wintrust Fin. Corp. et al.*, No. 1:22-cv-03968 (N.D. Ill. filed July 29, 2022); *Kistler et al. v. Stanley Black & Decker Inc. et al.*, No. 3:22-cv-00966-KAD (D. Conn. filed July 29, 2022); *Bracalente et al. v. Cisco Sys., Inc. et al.*, No. 5:22-cv-04417-VKD (N.D. Cal. filed July 29, 2022); *Tullgren v. Booz Allen Hamilton Inc. et al.*, No. 1:22-cv-00856-MSN-IDD (E.D. Va. filed Aug. 1, 2022); *Trauernicht et al. v. Genworth Fin. Inc., et al.*, No. 3:22-cv-00532-REP (E.D. Va. filed Aug. 1, 2022); *Hall et al. v. Cap. One Fin. Corp. et al.*, No. 1:22-cv-00857-PTG-JFA (E.D. Va. filed Aug. 1, 2022); *Beldock et al. v. Microsoft Corp. et al.*, No. 2:22-cv-01082-JLR (W.D. Wash. filed Aug. 2, 2022); *Antoine et al. v. Marsh & McLennan Cos. Inc. et al.*, No. 1:22-cv-06637-JPC (S.D.N.Y. filed Aug. 4, 2022); *Anderson v. Advance Publ'ns, Inc.*, No. 1:22-cv-06826-AT (S.D.N.Y. filed Aug. 10, 2022); *Abel v. CMFG Life Ins. Co.*, No. 3:22-cv-00449-wmc (W.D. Wis. filed Aug. 19, 2022).

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE BENEFIT ASSETS INC.

1    For plaintiffs' firms, these cases provide the ideal vehicle for this scattershot approach:  their

2    technical complexity makes it easy to create the appearance of factual disputes on the face of a

3    complaint, and if any single complaint survives a motion to dismiss, the prospect of particularly

4    costly and burdensome discovery often compels plan sponsors to agree to seven- or eight-figure

5    settlements.  Commentators estimate that over $1 billion in settlements have been paid in recent

6    years.[9]  While these suits have proven lucrative for a handful of plaintiffs' law firms, they have

7    provided negligible payouts for plan participants; skyrocketed plan costs in the form of settlements,

8    litigation fees, and fiduciary-liability insurance premiums; and caused disarray in the court system,

9    as various district courts confronted with identical complaints have reached disparate results.

10    **C.    The Supreme Court Set a High Bar for Pleading Imprudence**

11    Courts are not without tools to deal with the rising tide of strike suits.  The Supreme Court

12    has emphasized the importance of motions to dismiss as the primary procedural vehicle for

13    "weeding out meritless claims" in the ERISA imprudence context.  In *Fifth Third Bancorp v.*

14    *Dudenhoeffer*, 573 U.S. at 425, the Court confronted allegations that, among other things, plan

15    administrators had violated their duty of prudence by failing to act on both public and insider

16    information to insulate participants in an employee stock ownership plan ("ESOP") from impending

17    decreases in the company's stock price.  *Id.* at 413.

18    Relying on the teachings of *Twombly* and *Iqbal*, the Court declared that motions to dismiss

19    targeting imprudence claims "require[] careful judicial consideration of whether the complaint states

20    a claim that the defendant has acted imprudently."  *Id.* at 425 (citing Fed. R. Civ. P. 12(b)(6); *Iqbal*,

21    556 U.S. at 677–80; *Bell Atl. v. Twombly*, 550 U.S. 544, 554–563 (2007)).  The Court observed that

22    "[b]ecause the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the

23    time the fiduciary acts, the appropriate inquiry will necessarily be context specific."  *Id.* (citing 29

24    U.S.C. § 1104(a)(1)(B)).

25

26

---

27    [9] *See* Understanding Excessive Fee Claims at 2 (2021), *available at*  https://www.aig.com/
content/dam/aig/america-canada/us/documents/business/management-liability/pension-trustee-
28    excess-fees-fiduciary-whitepaper.pdf.

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE
AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE
BENEFIT ASSETS INC.

Applying these principles, the Supreme Court first held, with respect to the fiduciary's alleged failure to act on public information, that ERISA fiduciaries "could reasonably see 'little hope of outperforming the market . . . based solely on their analysis of publicly available information,'" and that absent a pleading of special circumstances foreclosing this line of fiduciary reasoning, plaintiffs would fail to state a claim. *Id.* at 426–27. Likewise, regarding the fiduciary's alleged failure to act on non-public information, the Court instructed lower courts to consider, among other things, "whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases . . . or publicly disclosing negative information would do more harm than good" by causing a reduction in the value of plan assets. *Id.* at 429–30; *accord Amgen Inc. v. Harris*, 577 U.S. 308, 311 (2016) (*per curiam*).

Critically, it was not enough for the *Dudenhoeffer* plaintiffs to plead that the plan fiduciary behaved imprudently by failing to act on public and insider information because, according to the Court, there were reasons the fiduciary *could have* prudently chosen not to act on such information. Together, these holdings confirm, in line with the heavily contextual analysis compelled for ERISA imprudence claims, that the operative standard requires plaintiffs to plead facts *necessarily* giving rise to the plausible inference of imprudent conduct. *Accord Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown "that the pleader is entitled to relief.") Put differently, if an allegedly imprudent decision *could have* been reached through a prudent process, the plaintiffs have failed to state a claim.

While *Dudenhoeffer* arose in the ESOP context, the Supreme Court has since applied its standards to the types of imprudence claims advanced here. In *Hughes v. Northwestern University*, a case involving imprudence allegations arising from purportedly high plan fees and alleged underperformance, the Supreme Court directed the lower court to apply the *Twombly-Iqbal* standard, again through the "necessarily . . . context specific" lens *Dudenhoeffer* set forth. 142 S. Ct. 737, 742 (2022) (citing *Dudenhoeffer*, 573 U.S. at 425). *Hughes* further observed, in complete alignment with the reasoning and rigorous pleading standard upheld in *Dudenhoeffer*, that "the

circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Id.*

Courts around the country have since followed *Dudenhoeffer's* reasoned approach in cases challenging the fees and investments in participant directed plans, for instance dismissing excessive fee claims where plaintiffs fail to rule out reasons a prudent fiduciary might select and retain services with higher fees, *see, e.g.*, *Albert v. Oshkosh Corp.*, 47 F.4th 570, 2022 U.S. App. LEXIS 24300, at *16 (7th Cir. Aug. 29, 2022) ("[T]he cheapest investment option is not necessarily the one a prudent fiduciary would select"); *accord Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167 (6th Cir. 2022); *Gonzalez v. Northwell Health, Inc.*, 2022 U.S. Dist. LEXIS 180110, at *26–28, *31–32 (E.D.N.Y. Sept. 30, 2022), and likewise dismissing underperformance claims because a prudent fiduciary could have concluded, for instance, that removing fund options based on short-term performance issues would frustrate long-term growth, *see, e.g.*, *Gonzalez*, 2022 U.S. Dist. LEXIS 180110, at *22–23; *Evans v. Associated Banc-Corp*, 2022 U.S. Dist. LEXIS 178430, at *18–21 (E.D. Wisc. Sept. 30, 2022); *Wehner v. Genentech, Inc.*, 2021 U.S. Dist. LEXIS 26227, at *26–27 (N.D. Cal. Feb. 9, 2021); *accord Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("No authority requires a fiduciary to pick the best performing fund.").[10]

## II.   PLEADING FUND UNDERPERFORMANCE IS INSUFFICIENT TO SATISFY THE *DUDENHOEFFER* STANDARD

This lawsuit and the cadre of contemporaneous copycat complaints[11] present a new front in the plaintiffs' bar's war against participant-directed employee retirement plans.  As one commentator observed, the allegations in these suits "stand in sharp contrast to the broader landscape of ERISA litigation," because, unlike past suits that alleged fiduciary imprudence for failing to provide funds that both performed better and had lower fees than a plan's offering, these

---

[10] The allegations in *Evans* involved a plan's retention of allegedly underperforming funds that were managed by an affiliate of the plan sponsor.  *Evans*, 2022 U.S. Dist. LEXIS 178430, at *18.  They thus provide an arguably stronger factual basis for ERISA fiduciary duty claims than the allegations here—which simply allege underperformance without any potential conflict of interest—and yet the district court still found them to be wholly inadequate to make out a claim for imprudence under the standard set forth in *Dudenhoeffer*.  *See id.* at *2–3.
[11] See *supra* n. 8.

new lawsuits allege only underperformance of the targeted funds, notwithstanding their low fees.[12] But, consistent with the foregoing analysis, a claim based solely on fund underperformance fails to satisfy the standard applied in *Dudenhoeffer* absent a plausible factual pleading that there is *no reason* that a prudent fiduciary could have chosen to include the allegedly underperforming fund.

Nor can plaintiffs meet *Dudenhoeffer*'s pleading demands by simply alleging the existence of funds with better past performance.  Such allegations skirt the highly contextual analysis required by *Dudenhoeffer* and its progeny in assessing whether plan fiduciaries acted prudently—an analysis that necessarily adopts a more comprehensive approach to assessing fund "performance" that will account not only for a fund's returns, but also its investment strategy and objectives.

### A.    Fund Underperformance Does Not Indicate an Imprudent Process

In selecting a plan's menu of options, plan fiduciaries have many choices to consider and many variables to weigh that might affect whether a particular fund option is the prudent choice for a given plan.  While past, or anticipated, performance is one variable to be considered, it is far from the only one.  A fiduciary must think about plan participants' specific needs, long-term goals, risk tolerance, and sophistication in determining what options will be available, and the services that will need to accompany those options.  Tailoring selections to the specific participants the plan will serve, a fiduciary must then evaluate each potential fund option on a range of variables including its investment strategy, asset allocations, level of risk, quality and type of management, past performance, the nature and cost of any accompanying services, and how any investment option will fit into the broader menu of options for participants, among other considerations.

*Dudenhoeffer* took the complex, multi-faceted nature of such fiduciary decisions into account, calling for a context-specific inquiry into a fiduciary's actions that considers the "difficult tradeoffs" and "range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 142 S. Ct. at 742.  It thus created a standard that could not be satisfied by fixating on a single variable—here, past performance—among the many a fiduciary must consider in selecting investment options for a plan.  As the Sixth Circuit aptly put it, "disappointing

---

[12] John Manganaro, *More TDF Underperformance ERISA Lawsuits Filed*, Plan Adviser (Aug. 15, 2022), *available at* https://www.planadviser.com/tdf-underperformance-erisa-lawsuits-filed/.

performance by itself does not conclusively point towards deficient decision-making, especially

when we account for 'competing explanations' and other 'common sense' aspects of long-term

investments." *CommonSpirit Health*, 37 F.4th at 1167 (citation omitted).  There are many reasons

beyond past performance that a fiduciary may choose to include a given investment option, and

*Dudenhoeffer* puts the burden on plaintiffs to plead a specific set of circumstances that rules them

out.  Pleading past underperformance alone cannot satisfy this requirement.

The present case is again illustrative:  there are many good reasons a fiduciary might choose

to include the BlackRock Lifepath Index Funds ("Blackrock TDFs"), even accepting Plaintiffs'

claims (discussed further in the next section) that they have underperformed a handful of market

leading TDF funds.  For one, BlackRock TDFs provide a fund option with lower fees than other

market-leading TDFs.  Though the complaint here glibly observes that it is "in vogue" to "chase[]

low fees," Compl. ¶ 31, Plaintiffs' counsel would surely agree that a fiduciary should take

reasonable steps to minimize fee expenses; otherwise counsel would not have filed several other

lawsuits around the country alleging fiduciary imprudence for offering funds with excessive fees.[13]

Savings on fee expenses inure directly to the benefit of plan participants, and costs are therefore a

significant factor fiduciaries consider in selecting fund offerings.

Additionally, a prudent fiduciary could choose to offer the BlackRock TDFs based on their

investment strategy.  While target date funds, taken generally, offer an option that mitigates risk by

automatically investing in a gradually more conservative mix of assets as plan participants approach

retirement, the BlackRock TDFs provide a particularly risk-averse option.  First, the BlackRock

TDFs' underlying holdings are passively managed, protecting them from certain risks such as

---

[13] *See, e.g.*, *CommonSpirit Health*, 37 F.4th at 1169 (affirming dismissal of complaint filed by plaintiffs' counsel alleging, among other things, that actively managed fund options provided by a plan charged excessive fees); Nevin E. Adams, JD, *Law Firm Files Another Excessive Fee Suit Targeting TDFs*, Nat'l Assoc. of Plan Advisors (July 8, 2020), *available at* https://www.napa-net.org/news-info/daily-news/law-firm-files-another-excessive-fee-suit-targeting-tdfs; Nevin E. Adams, JD, *ADP MEP Tapped in Excessive Fee Suit*, Nat'l Assoc. of Plan Advisors (May 5, 2020), *available at* https://www.napa-net.org/news-info/daily-news/adp-mep-tapped-excessive-fee-suit; Nevin E. Adams, JD, *Gucci Plaintiffs Bag Settlement in Excessive Fee Suit*, Nat'l Assoc. of Plan Advisors (June 25, 2019), *available at* https://www.napa-net.org/news-info/daily-news/gucci-plaintiffs-bag-settlement-excessive-fee-suit; Nevin E. Adams, JD, *Two Excessive Fee Suits Settled*, Nat'l Assoc. of Plan Advisors (Apr. 25, 2019), *available at* https://www.napa-net.org/news-info/daily-news/two-excessive-fee-suits-settled.

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE BENEFIT ASSETS INC.

management underperformance and style drift—or departure from the fund's investment objectives—that are associated with active management.[14]  Second, as Plaintiffs acknowledge in their complaint, the BlackRock TDFs use a "to retirement" glidepath, insulating retirees from drastic short-term losses made possible from market downturns occurring close to and after participants reach retirement age.  Including a TDF suite with a "to retirement" glidepath gives participants the buffer of a more conservative investment mix as they near retirement, whereas other, "through retirement" TDFs typically provide more equity exposure, and thus less of a buffer against market downturns in exchange for the opportunity for more growth after participants reach retirement age.[15]  Either or both options may be appropriate depending, again, on the specific goals and interests of plan participants.[16]  *See generally Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133, 1150 (N.D. Cal. 2022) (discussing diversity of investment strategies and other key features of TDFs).

Lastly, a prudent fiduciary might also be inspired to choose to offer BlackRock TDFs based on their quality of management.  The Morningstar 2022 Target-Date Strategy Landscape report ("TDF Landscape Report"), which Plaintiffs rely on heavily in the Complaint, gives the Blackrock TDFs an analyst rating of gold—the highest available.[17]  Morningstar analyst ratings are based on the experience and qualifications of fund managers, the quality of their research, decision-making, and loyalty to fund strategy, and the overall investment culture of the asset manager—here

---

[14] *See* John Rosevear, *What You Need to Know About Active vs. Passive Investing*, The Motley Fool (Jul. 5, 2022) (explaining differences in fees and risk profile of active versus passive management), *available at* https://www.fool.com/investing/how-to-invest/active-vs-passive-investing/; *see also CommonSpirit Health*, 37 F.4th at 1163 (discussing functional differences between passively and actively managed funds); *accord* Compl. ¶ 27.

[15] Notwithstanding the Complaint's assertion that BlackRock TDFs should not have been designated as the plan's Qualified Default Investment Alternative ("QDIA"), *see* Compl. ¶ 33, the BlackRock TDFs' dynamic investment path over time—characteristic of all TDFs—combined with its uniquely risk-averse properties actually make it the ideal choice for a plan QDIA, especially given that investors who use the default option are the least likely to shift their investment strategies in response to changing market conditions.

[16] *See* Megan Pacholok & Karen Zaya, *2022 Target-Date Strategy Landscape*, Morningstar at 38 (Mar. 23, 2022) ("TDF Landscape Report") ("The lighter equity allocations at retirement that come with the 'to' approach are better fits for investors with lighter risk appetites.  Conversely, those who have iron stomachs are better served by the more stock-heavy 'through' options."), *available at* https://www.morningstar.com/lp/tdf-landscape.

[17] *Id.* at 19–20.

BlackRock.[18]  A gold rating means that, based on the foregoing factors, Morningstar analysts believe a fund is among the most likely to outperform its peers.[19]  Because a fund is often only as good as its management, management quality is another important factor plan fiduciaries consider, and another that weighs in favor of providing BlackRock TDFs as an investment option.

These factors and possibly others, both taken in isolation but also especially taken together, provide strong reasons a prudent fiduciary might choose to include BlackRock TDFs among plan investment offerings.  BlackRock TDFs are not unique in this respect; there may be many factors that counsel in favor of including a fund—even where such a fund does not have the best performance track record in the market—that could allow a prudent fiduciary employing a reasonable selection process to offer them as part of a plan.

While the BlackRock TDFs offer various examples of such considerations, it does not fall on fiduciaries to present alternative reasons for offering an "underperforming" fund at the pleading stage; rather, under *Twombly*, *Iqbal*, and *Dudenhoeffer*, it is the plaintiff's burden to plead facts showing that including a given fund was *necessarily* imprudent.  Simply claiming fund underperformance will never meet this bar.  The *Dudenhoeffer* standard therefore forecloses complaints based solely on fund performance, including the one here.

**B.      Underperformance Claims Adopt a Superficial Understanding of Performance That Fails to Meet the *Dudenhoeffer* Standard.**

The foregoing analysis takes the Plaintiffs' claims about Blackrock TDF performance at face value (and shows that complaints like this one must be dismissed even so), but any fulsome consideration of fund performance must acknowledge that "performance" is not a monolithic metric. To measure a fund's true performance, a fiduciary should not merely examine returns; the fiduciary must look at those returns in light of the fund's objectives and investment strategy.  "'A complaint cannot simply make a bare allegation that costs are too high, or returns are too low;'" rather, "an allegation that a fund is mismanaged must be fact-specific 'because there is no one-size-fits-all

---

[18] Sachin Nagarajan, *What is the Morningstar Analyst Rating™ for funds?*, Morningstar (Sept. 22, 2021), *available at* https://www.morningstar.com/investing-definitions/morningstar-analyst-rating-for-funds.
[19] *Id.*

approach to investment.'" *Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d at 1154 (quoting *Davis v. Wash. Univ.*, 960 F.3d 478, 484 (8th Cir. 2020)).

For instance, where a fund is designed with a conservative investment strategy and loss mitigation in mind, it may yield smaller returns than less risk averse funds of the same category during a bull market.  Yet, this more conservative fund will outperform its bullish counterparts in a down market.  Thus, examining the more conservative fund's performance during a period of robust market performance will not yield an accurate picture of the fund's overall performance potential, particularly over the years, if not decades, that retirement fund investments must contemplate.

Drawing on the complaint once more as an example, all of the funds identified as comparators use a more risk-heavy "through" glidepath compared to the BlackRock TDFs' more conservative "to" glidepath for asset allocation.  It is therefore unsurprising that the comparators yielded higher returns during the bull market periods identified in the complaint.  However, the complaint's assessment of BlackRock TDFs' performance fails to account for the protection from market dives they provide for plan participants closing in on retirement age.

One can see this protection at work in the first quarter of 2020 when the market experienced a short-term COVID-related downturn.  During that quarter, the BlackRock TDF vintages that were closing in on retirement (and therefore had lower equity allocations) outperformed every single alleged comparator, providing greater protection to plan participants' retirement savings from the downturn as those participants approached the time when they would need that savings the most.  Morningstar's TDF Landscape Report illustrates the difference.[20]  Were the market to suffer a longer-term or more severe decline—as looks increasingly likely over the coming months— BlackRock TDFs provide among the safest choices for plan participants who are approaching retirement.

Notwithstanding that reality, this suit and its carbon copies in effect allege that BlackRock TDFs are *per se* imprudent as a plan investment option.  In addition to flouting the context-heavy analysis necessary when evaluating imprudence allegations, these suits, and any similar ones

---

[20] *See* TDF Landscape Report at 37–38 & Ex. 38.

alleging imprudence on the basis of fund returns alone, offend bedrock ERISA fiduciary principles in two ways.

First, allegations based solely on investment returns—especially over relatively short three- and five-year time horizons like the allegations here—force the assessment of imprudence to impermissibly rely on hindsight appraisals of fiduciary actions, rather than examining their prudence based on the information the fiduciary had at the time and in light of their overall investment strategy.  Again using the present suit as an example, Plaintiffs' theory ignores the fact that target date funds like the BlackRock TDFs are by their very design long-term investments. Plaintiffs claim that short-term past performance required prudent plan fiduciaries to switch away from BlackRock TDFs to the other, riskier comparator TDFs with "through" glidepaths which were alleged to be more lucrative in the recent bull market.  If Plaintiffs' theory were credited, however, it would effectively render plan fiduciaries' failure to predict the longest bull market in United States stock market history to be imprudent, penalizing them for mitigating risk and upholding their investments' long-term growth strategy.[21]  Fortunately, the fundamental principle that ERISA "requires prudence, not prescience," *Rinehart*, 817 F.3d at 63–64 (citation omitted), forecloses this conclusion, and plan fiduciaries are not only encouraged, but *required* to balance returns with risk, including planning for downturns.  Yet suits like the present one that superficially present past fund returns, irrespective of investment strategy and other relevant factors, as the end-all-be-all measure of performance threaten to put hindsight in the driver's seat.

Second and relatedly, suits that allege imprudence solely based on investment returns without accounting for investment strategy are more likely to present inaccurate or cherry-picked comparators.  If courts permit comparisons like the ones at issue here to suffice to survive a motion to dismiss, then virtually every suit will be able to survive a motion to dismiss, as it is almost always possible to show other funds that performed better during a past period. "To show that 'a prudent fiduciary in like circumstances' would have selected a different fund based on the cost or

---

[21] "The longest bull market in U.S. stock market history began in the depths of the financial crisis in 2009 and lasted almost exactly 11 years, until the COVID-19 pandemic brought it to a close."  Jeff Reeves, *Bull Market Definition*, U.S. News & World Report (Mar. 2, 2022), *available at* https://money.usnews.com/investing/term/bull-market.

performance of the selected fund," ERISA case law requires plaintiffs to "provide a sound basis for comparison—a *meaningful* benchmark." *Meiners*, 898 F.3d at 822 (emphasis added).  Presenting a meaningful benchmark is not just about labels; it requires identification of alternatives with the same investment strategy, lest comparisons in returns create a skewed and inaccurate picture of overall performance.  "The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether [another fund was] an imprudent choice at the outset."  *Id.* at 823 (holding that two TDF funds were not meaningfully comparable because one had a higher allocation of bonds than the other).

The alleged comparators in the present suit all use a wholly different "through-retirement" investment strategy that will yield different returns under different conditions compared to BlackRock TDFs.  The alleged comparators also include actively managed funds, such as the American Funds and T. Rowe Price funds, that have different investment goals and strategies than the passively managed funds that comprise the BlackRock TDFs.  Plaintiffs attempt to sidestep this lack of comparability by alleging that the selected comparators are valid comparison benchmarks because they are also TDFs with a large market share of total TDF assets under management, and are therefore the most likely alternative choices to replace BlackRock TDFs in a plan investment option line-up.  *See* Compl. ¶ 38.  But that amounts to an admission that the only thing the BlackRock TDFs and the comparators have in common besides their "TDF" label is their size, a measure that is not particularly meaningful or relevant for determining fiduciary prudence. Contrary to Plaintiffs' claim, a prudent plan fiduciary is more likely to replace the BlackRock TDFs with another TDF suite with passively managed holdings and a to-retirement glidepath, replicating the risk profile and investment strategy of BlackRock TDFs that was likely tailored to the plan participants' specific goals in the first place.

Fortunately, *Dudenhoeffer* takes these realities into account, requiring plaintiffs to plead facts that compel the inference that the fiduciary acted imprudently by ruling out any other plausible explanation.  Underperformance claims like the present one, which fail to account for differences in

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE BENEFIT ASSETS INC.

1  investment strategy between funds that might well explain why a prudent fiduciary would choose an

2  "underperforming" fund, automatically fail this test.

3  **III.    ALLOWING PLAINTIFFS' CLAIMS TO GO FORWARD WILL HAVE FAR-
       REACHING NEGATIVE CONSEQUENCES FOR PLAN SPONSORS,
4       FIDUCIARIES, AND PARTICIPANTS**

5         *Dudenhoeffer* and the core principles of ERISA fiduciary law that undergird it require

6  dismissal of this complaint and its many clones filed in seven different districts from coast to coast.

7  If plaintiffs' multi-pronged pressure test finds even one weak point in the dam the Supreme Court

8  erected with *Dudenhoeffer*, the flood of litigation will be substantial, working to the significant

9  detriment of the courts, plan sponsors, and ultimately the participants themselves.

10        The costs of plaintiffs' prolific imprudence claims over recent years have already been

11  staggering.  Since 2015, plan sponsors have issued more than $1 billion in settlements, including

12  $330 million in legal fees that represent a direct and needless cost to plan providers.[22]  Even plans

13  that have never been subject to suit are suffering, as the costs associated with fiduciary liability

14  insurance, which is necessary for effective plan administration, have skyrocketed.  In a sea change

15  across the industry over the past two years, almost all fiduciary liability policies covering excessive

16  fee and underperformance claims now feature seven- and eight-figure retention numbers, meaning

17  that plan sponsors must pay the first $10 or even $15 million in legal fees before liability policies

18  will begin to pay out to defend imprudence claims, and the premiums associated with these policies

19  have also continually risen.[23]

20        The central reason for the marked increase in insurance costs is insurers' inability to clearly

21  gauge a plan's litigation risk and accompanying exposure to considerable legal and potential

22  settlement costs.  This should not come as a surprise—with hundreds of cookie-cutter complaints

23  landing simultaneously in district courts across the country, there is bound to be some inconsistency

24  in rulings at the motion-to-dismiss stage.  With little predictability as to what such claims will

25  allege, no sponsor or fiduciary of a defined contribution plan is safe from suit.  Making matters

26  _____

[22] Understanding Excessive Fee Claims at 2.

27 [23] Jacklyn Wille, *Spike in 401(k) Lawsuits Scrambles Fiduciary Insurance Market*, Bloomberg Law
   (Oct. 18, 2021), *available at* https://news.bloomberglaw.com/ employee-benefits/spike-in-401k-
28  lawsuits-scrambles-fiduciary-insurance-market.

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE
AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE
BENEFIT ASSETS INC.

worse, due to the enormous discovery costs associated with defending such suits and the costs of

taking them through trial, most claims that survive a motion to dismiss end up settling, incurring

significant legal fees and settlement costs for plans and insurers in the process, all in exchange for

very modest payouts for individual participants. Thus, although these lawsuits are exceedingly

unlikely to reach a determination of imprudence on the merits, unpredictable and excessive

litigation and settlement costs nevertheless cause insurance prices to escalate continually for all

defined contribution plans.

Any ruling allowing the present claims to survive will greatly exacerbate all of these

problems. The Complaint here represents a new frontier in attempts to impose imprudence liability

on plan fiduciaries: the Plaintiffs effectively seek a ruling that inclusion of BlackRock TDFs among

plan investment options is *per se* imprudent. If that is correct, or even deemed sufficient to

overcome a motion to dismiss, then every plan to offer BlackRock TDFs—investment products that,

according to the Complaint itself, account for 8.8% of the entire market share in TDFs[24]—will face

litigation exposure.

Aside from the sprawling exposure and accompanying legal and insurance costs arising

directly from this case, such a ruling will additionally set a dangerous precedent, subjecting the

fiduciaries here to potential liability, or at least defense costs, for providing a well-managed,

impeccably rated, low-fee, risk averse investment option simply because it failed to outperform the

four top funds in its broad TDF category solely on short-term returns. In the words of one

commentator, these lawsuits—and certainly any decision allowing them to proceed—will no doubt

leave plan sponsors "wondering what, if any, investment strategy is safe."[25]

Indeed, this suit highlights the issue in multiple ways—whereas ERISA fiduciary suits in the

past have targeted plan fiduciaries for offering investment options that allegedly had excessive fees

and featured actively managed funds carrying too much risk, the present suit takes the exact

opposite tack, attacking fiduciaries for choosing a lower fee, passively managed option because it is

---

[24] *See* Compl. ¶ 37; *see also* TDF Landscape Report at 12, Ex. 13.

[25] Austin R. Ramsey, *BlackRock 401(k) Investment Suits Send Message 'Nobody's Safe,'* Bloomberg Law (Aug. 10, 2022), *available at* https://news.bloomberglaw.com/daily-labor-report/blackrock-401k-investment-suits-send-message-nobodys-safe.

*too risk averse*, and therefore failed to generate the same returns under transitory market conditions as its more risk-friendly peers.  Any finding for Plaintiffs here would thus truly put fiduciaries who are selecting plan investment options between a rock and a hard place.

To the extent allowing the present claims to go forward would send *any* clear message, it would be that fiduciaries must chase past performance, rather than tailoring investment options to the specific participant population a plan serves or giving due consideration to the many other factors that should inform plan investment offerings.  Such a ruling would likewise deter risk mitigation, and would also lead to large losses, compelling plans to continually buy high and sell low. This cannot be what the Supreme Court envisioned when it instructed lower courts to "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes,* 142 S. Ct. at 742.  Ironically, in exalting past performance over other factors, sponsors would be abdicating their fiduciary duties rather than upholding them.

Facing climbing costs and liability exposure, and especially given the trend of plaintiffs' suits now targeting smaller employers, many may decide that a defined contribution plan is simply not a benefit worth providing, an outcome that runs counter to Congress's intent in passing ERISA to protect employees' retirement benefits.[26]  Those that continue to offer a plan will face not only increasing costs, but also a dwindling palette of investment options to present to participants, as only the options that provide the largest short-term returns on investment (and with them, the largest amount of risk) will have any degree of safety from litigation exposure.

Given the discovery costs and settlement dynamics in these cases, we cannot count on subsequent discovery and trial practice to vindicate Defendants' arguments if Plaintiffs' claims are

---

[26] *See* 29 U.S.C. § 1001(a).  The provision of a defined benefit plan, an option available to an ever decreasing number of American private employees, will not be a viable alternative for many of these small employers.  Individual account plans like those here were conceived to encourage plan sponsors concerned with the risk of guaranteeing set retirement benefit amounts to nevertheless provide benefits programs, enabling sponsors to avoid that risk by allowing employees to make and direct their own retirement investments (with tax and contribution-matching incentives to do so). *See* Elizabeth Bauer, *Fact Check: Were 401(k)s Really an 'Accident of History'?*, Forbes (Mar. 7, 2020), *available at* https://www.forbes.com/sites/ebauer/2020/03/07/fact-check-were-401ks-really-an-accident-of-history/?sh=7677a0356110.  The present spat of suits undermines this purpose by again effectively making sponsors the guarantors of retirement funds, using hindsight appraisals of performance to hold sponsors accountable for losses.

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE BENEFIT ASSETS INC.

allowed to proceed.  Luckily, nothing compels this court to bring this parade of horribles about in

the first place.  To the contrary, *Dudenhoeffer* forecloses the present suit.  Because Plaintiffs have

failed to plead facts that rule out the use of a prudent process in electing to offer the BlackRock

TDFs, the Complaint must be dismissed.

## CONCLUSION

For all the foregoing reasons, this Court should grant Defendants' motion to dismiss in full.

DATED:  November 7, 2022                    Respectfully submitted,


RUSSELL L. HIRSCHHORN (*pro hac vice* pending)
MYRON D. RUMELD (*pro hac vice* pending)
JOHN E. ROBERTS (*pro hac vice* pending)
ADAM L. DEMING (*pro hac vice* pending)
PHILIPPE A. LEBEL


By:  _____/s/  Philippe A. Lebel_____

*Counsels for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2022, I caused a true and correct copy of the foregoing to be served upon all counsel of record via electronic filing with the Clerk of the Court using the CM/ECF system.

/s/ Philippe A. Lebel

Philippe A. Lebel, SBN 274032
plebel@proskauer.com
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone:     (310) 557-2900
Facsimile:     (310) 557-2193

Russell L. Hirschhorn (*pro hac vice* pending)
rhirschhorn@proskauer.com
Myron D. Rumeld (*pro hac vice* pending)
mrumeld@proskauer.com
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
Telephone:     (212) 969-3000
Facsimile:     (212) 969-2900

John E. Roberts (*pro hac vice* pending)
jroberts@proskauer.com
Adam L. Deming (*pro hac vice* pending)
ademing@proskauer.com
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110-2600
Telephone:     (617) 526-9600
Facsimile:     (617) 526-9899

AMICI CURIAE BRIEF OF THE AMERICAN BENEFITS COUNCIL, THE ERISA INDUSTRY COMMITTEE, THE AMERICAN RETIREMENT ASSOCIATION, AND THE COMMITTEE ON INVESTMENT OF EMPLOYEE BENEFIT ASSETS INC.