## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| ROBERT BRACALENTE and BORIS GDALEVICH, individually and as representatives of a class of similarly situated persons, on behalf of the CISCO SYSTEMS, INC. 401(K) PLAN,<br><br>Plaintiffs,<br><br>v.<br><br>CISCO SYSTEMS, INC.; THE BOARD OF DIRECTORS OF CISCO SYSTEMS, INC.; and THE 401(K) PLAN ADMINISTRATION COMMITTEE OF CISCO SYSTEMS, INC.,<br><br>Defendants. | Case No: 5:22-cv-04417-EJD<br><br><br>**AMENDED CLASS ACTION COMPLAINT** |

## I.    INTRODUCTION

1.    Plaintiffs, Robert Bracalente ("Bracalente") and Boris Gdalevich ("Gdalevich") (collectively, "Plaintiffs"), individually in their capacity as participants of the Cisco Systems, Inc. 401(k) Plan ("Plan"), bring this action ("Action") under 29 U.S.C. § 1132, on behalf of the Plan and a class of similarly-situated participants and beneficiaries of the Plan, against Defendants, Cisco Systems, Inc. ("Cisco"), the Board of Directors of Cisco Systems, Inc. ("Board"), and the 401(k) Plan Administration Committee of Cisco Systems, Inc. ("Committee" and collectively, "Defendants"), for breach of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., and related breaches of applicable law beginning six years from the date the initial complaint originating this action was filed and continuing to the date of judgment, or such other date the Court determines is appropriate and just ( "Class Period").

2.      Defined contribution plans (*e.g.*, 401(k) and 401(a) plans) that are qualified as tax-deferred vehicles have become the primary form of retirement saving in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, the participants in defined contribution plans bear the risk of high fees and investment underperformance.

3.      The importance of defined contribution plans to the United States retirement system has become pronounced as employer-provided defined benefit plans are increasingly rare as an offered and meaningful employee benefit.

4.      As of December 31, 2020, the Plan had 59,460 participants with account balances and assets totaling approximately $16.43 billion, placing it in the top 0.1% of all defined contribution plans by plan size.[1]  Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of defined contribution plans and the investment of defined contribution assets.  The marketplace for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5.      Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative services.  Defendants are fiduciaries under ERISA, and, as such, owe specific duties to the Plan

---

[1]Brightscope & Investment Company Institute, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018 (pub. July 2021).

and its participants and beneficiaries, including obligations to act for the exclusive benefit of participants, ensure that the investment options offered through the Plan are prudent and diverse, and ensure that Plan expenses are fair and reasonable in relation the services obtained.  These fiduciary duties are well understood to be the "highest known to law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (citing *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

6.      Defendants have breached their fiduciary duties to the Plan.  As detailed below, Defendants (directly or through the Committee or the Board, defined below) selected, retained, and/or otherwise ratified unsuitable investments instead of offering prudent alternative investments that were readily available at all times Defendants selected and retained the funds at issue and throughout the Class Period.  Since Defendants (directly or through the Committee or the Board, defined below) have discretion to select the investments offered to participants, Defendants' breaches are the direct cause of the losses alleged herein.

7.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under Sections 404, 409 and 502 of ERISA, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class ("Class") as the Court may deem appropriate and just under the circumstances.

8.      Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

    a.      A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

-3-

b.      A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

c.      Equitable, legal or remedial relief for all losses and/or compensatory damages;

d.      Attorneys' fees, costs and other recoverable expenses of litigation; and

e.      Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.      THE PARTIES

9.      Bracalente is a former employee of Cisco and participant in the Plan under 29 U.S.C. § 1002(7).  Bracalente is a resident of Honey Brook, Pennsylvania.  During the Class Period, Bracalente maintained an investment through the Plan in the BlackRock LifePath Index 2030 Fund, the BlackRock LifePath Index 2040 Fund, the BlackRock U.S. Equity Market Index Fund, the BlackRock International Equity Fund, the BlackRock U.S. Debt Index Fund and the Stable Value Fund.

10.     Gdalevich is a former employee of Cisco and former participant in the Plan under 29 U.S.C. § 1002(7).  Gdalevich is a resident of Needham, Massachusetts.  During the Class Period, Gdalevich maintained an investment through the Plan in the BlackRock LifePath Index 2045 Fund and the BlackRock LifePath Index Retirement Fund.

11.     Cisco is a public Delaware corporation headquartered in San Jose, California. Cisco develops, manufactures, and sells networking hardware, software, telecommunications equipment and other high-technology services and products.

12.     The Board of Directors a/k/a the Board of Directors of Cisco Systems, Inc. (the "Board") appointed "authorized representatives" of Cisco, including the 401(k) Plan Administration Committee of Cisco Systems, Inc. ("Committee"), as plan fiduciaries.  The Board and the individual members of the Board were/are fiduciaries of the Plan under ERISA pursuant to 29 U.S.C. §§ 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.  The Board and the individual members of the Board who served at any time from July 29, 2016 to the present are referred collectively hereafter as the "Board."

13.     The Committee and its individual members are responsible for the general administration of the Plan and each are fiduciaries under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Committee maintains its address at Cisco's corporate headquarters in San Jose, California.  The Committee and its members are appointed by Cisco or its delegate to administer the Plan on Cisco's behalf.  The Committee and the individual members of the Committee who served at any time from July 29, 2016 to the present are referred collectively hereafter as the "Committee."

### III.    JURISDICTION AND VENUE

14.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

15.     This Court has subject matter jurisdiction over the Action pursuant to 28 U.S.C. § 1331 because the Action arises under the laws of the United States.

16.     Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Cisco's principal place of business is in this District and the Plan is administered from this judicial district.  Further, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

17.     Plaintiffs have standing to bring the Action because they maintained investments in the Plan in the investment options challenged in the Action during the Class Period.  Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by the Court.  In addition, although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

### IV.    FACTUAL ALLEGATIONS

**A.    Background and Plan Structure**

18.     The Plan is a participant-directed 401(k) plan, meaning participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with their participant contributions, applicable employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays expenses from Plan assets, and the majority of administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The investment

options made available to Plan participants include various mutual funds, collective trust funds and a self-directed brokerage account.

19.    Mutual funds are publicly traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the U.S. Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

20.    Collective trusts are, in essence, mutual funds without the SEC regulation. Collective trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments.  Collective trusts were first organized under state law in 1927 and were blamed for the market crash in 1929.  As a result, collective trusts were severely restricted, giving rise to the more transparent and publicly-traded mutual funds described above.  Today, banks create collective trusts only for their trust clients and for employee benefit plans, like the Plan.  Despite their historic lack of transparency, modern collective trust sponsors provide sufficient information for investors to make informed decisions about the merits of investing in collective trusts.  The main advantage of opting for a collective trust, rather than a mutual fund, is the negotiability of the fees; accordingly, larger retirement plans should be able to leverage their size for lower fees.

21.    During the Class Period, Plan assets were held in a trust by the Plan trustee, Wells Fargo, and subsequently, Principal Financial Group.  All investments and asset allocations are performed through this trust instrument.

22.    Throughout the Class Period, Defendants maintained an Investment Policy Statement ("IPS"), as amended from time to time, to provide the Committee with guidelines concerning the selection, evaluation and monitoring of Plan investment options.

23.    The consistent application of the guidelines in an IPS is a vital component of a prudent investment selection and monitoring process and, when employed properly, ensures that investment funds are assessed in a replicable manner.  When plan fiduciaries adopt an IPS, the IPS becomes a binding plan document.[2]  In addition, prevailing standards dictate that plan fiduciaries familiarize themselves with an effective IPS, rely on an effective IPS in the course of monitoring a plan's investments, and do not violate the guidance set forth in an IPS.

24.    For the entirety of the pertinent period, the  IPS prescribed review of the Plan's investments over three- and five-year periods compared to a representative benchmark and a universe of similar funds.  Under the IPS, the Committee is directed to closely examine performance that falls below those comparators over a market cycle, generally represented by a three- to five-year period.  The IPS expressly permits the Committee to remove an investment if, in its judgment, the fund is unlikely to meet the stated performance objectives in the future. Importantly, the IPS does not require the satisfaction of any condition beyond underperformance for a Plan investment to be deemed noncompliant, indicating that the Plan's fiduciaries were instructed to make decisions, at times, solely based on a fund's underperformance.

## B.    **Target Date Funds**

25.    A target date fund ("TDF") is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more

---

[2]*See* Fred Reish and Joan Nerl, An IPS 'Sets' The Standard: Once adopted, the document must be followed, PLANSPONSOR (Sept.-Oct. 2019), available at: bit.ly/3Z1Kirl (last visited Sept. 1, 2023).

conservative as the assumed target retirement year approaches.  TDFs offer investors dynamic, straightforward asset allocation, while providing both long-term growth and capital preservation. All TDFs are inherently actively managed, because managers make changes to the funds' allocations to stocks, bonds, and cash over time.  These allocation shifts are referred to as a fund's glide path.

26.    TDF glide paths are managed either "to" or "through" retirement.  A "to retirement" glide path generally assumes participants will withdraw their funds once they reach the presumed retirement age, or soon thereafter.  The asset allocation of a "to retirement" TDF remains static once the retirement date is reached.  A "through retirement" glide path expects participants to remain invested after reaching retirement and gradually draw down on their funds. Accordingly, the terminal allocation of a "through" TDF is not reached until a predetermined number of years after the target date.

27.    "To" strategies are managed to protect against the risk of a market decline significantly diminishing assets, while the "through" approach focuses on the risk of outliving savings.  Each strategy treats the other's primary focus as a secondary objective (*i.e.*, most "to" managers "have the objective of limiting portfolio volatility up to retirement as the primary goal, and the income throughout retirement is more of a secondary objective.").[3]  TDFs designed to take investors to retirement typically de-risk faster than their "through" peers, and while this may offer greater potential protection against downside risk, it leaves investors exposed to the potentially  devastating consequences of running out of money in retirement.  The U.S. Department of Labor observed that "to retirement" funds "are concentrated in more conservative

---

[3]Amanda Umpierrez, *Evaluating 'To' vs. 'Through' Glide Paths*, PLANSPONSOR (Feb. 17, 2021), available at: bit.ly/44IGz3i (last visited Sept. 1, 2023).

and less volatile investments at the target date, assuming that employees will want to cash out of the plan on the day they retire."[4]  Investment analyst firm Morningstar concurs that "[m]anagers build a 'through' retirement glide path to account for a participant taking regular distributions in retirement from the fund, while they construct 'to' glide paths using the assumption that an investor will take the money out at retirement."[5]  Presentation materials provided to the Committee by its investment advisor, Aon Hewitt, describe the design of a "to" glide path in the same manner.  As retirees trend toward keeping savings in their retirement plans post-retirement, "through" glide paths have been more widely utilized.[6]  Indeed, of the 28 TDF suites launched in the past decade which remain active, nearly 80% adopt a "through" approach.[7]

28.    The underlying mutual funds that TDF managers choose to populate each asset class can be actively or passively managed.  TDFs comprised of primarily or entirely passive strategies provide broad market exposure at minimal cost and avoid the risk of active management underperformance and style drift.  TDFs filled with actively managed funds tend to provide more diversified asset class exposure while offering the potential for excess returns, particularly in less efficient asset classes where active management tends to outperform.

**C.    Defendants' Breaches of Fiduciary Duties**

29.    As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and loyalty to the Plan.  Plaintiffs did not acquire actual knowledge regarding

---

[4]Target Date Retirement Funds—Tips for ERISA Plan Fiduciaries, U.S. DEP'T OF LABOR (Feb. 2013), available at: bit.ly/3r52RhD (last visited Sept. 1, 2023).

[5]Right on Target? Plan Sponsors May Not Always Consider Participants' Behavior or Needs When Selecting Target-Date Glide Paths, MORNINGSTAR (July 2022).

[6]*Id.*

[7]2022 TARGET-DATE STRATEGY LANDSCAPE, MORNINGSTAR (2022).

Defendants' breaches at issue here until shortly before the initial complaint originating this action was filed.

### 1. The Plan's Investment in the BlackRock LifePath Index Funds

30. Among other investments, the Plan lineup has, since January 1, 2011, offered the BlackRock LifePath Index Funds ("BlackRock TDFs"), a suite of ten TDFs.[8] The BlackRock TDFs are significantly worse performing than many of the mutual fund alternatives offered by TDF providers, routinely failed the evaluative criteria set forth in the Plan's IPS, and, throughout the Class Period, could not have supported an expectation by prudent fiduciaries that their retention in the Plan was justifiable.

31. Defendants were responsible for crafting the Plan lineup and could have chosen from a wide range of prudent alternative target date families offered by competing TDF providers, which are readily available in the marketplace, but elected to retain the BlackRock TDFs instead, an imprudent decision that has deprived Plan participants of significant growth in their retirement assets.

32. A simple weighing of the merits and features of all other available TDFs at the beginning of the Class Period, including their actual realized outcomes, and not solely projections that relied on estimates and assumptions, would have raised significant concerns for prudent fiduciaries and indicated that the BlackRock TDFs were not a suitable and prudent option for the Plan. In addition, any objective evaluation of the BlackRock TDFs consistent with the guidance in the Plan's IPS would have resulted in the selection of a more consistent, better performing, and more appropriate TDF suite. Instead, as is currently in vogue, Defendants

---

[8]The Plan offered an eleventh BlackRock TDF, the 2020 vintage, for a substantial part of the Class Period. During the Fourth Quarter of 2019, the 2020 Fund was reorganized into the Retirement Fund, and shareholders of the 2020 Fund received shares of the Retirement Fund.

appear to have chased the low fees charged by the BlackRock TDFs without any consideration of the value provided in exchange for such fees, in the form of the risk/return tradeoff to participant account balances.  Had Defendants carried out their responsibilities in a single-minded manner with an eye focused solely on the interests of the participants, they would have come to this conclusion and acted upon it.  Defendants, however, failed to act in the sole interest of Plan participants and breached their fiduciary duties by failing to appropriately monitor and consequently retaining the clearly unsuitable BlackRock TDFs.

33.     Since the fiduciaries here employed a fundamentally irrational decision-making process (*i.e.*, inconsistent with their duty of prudence) based upon basic economics and established investment theory, they clearly breached their fiduciary duties under ERISA—which are well-understood to be the "highest known to law." *Howard*, 100 F.3d at 1488 (citing *Bierwirth*, 680 F.2d at 272 n.8).

34.     Exacerbating Defendants' imprudent decisions to add and retain the BlackRock TDFs is the suite's designation as the Plan's Qualified Default Investment Alternative ("QDIA"). The BlackRock TDF with the target year closest to a participant's assumed retirement age (*i.e.*, age 65) has served as the QDIA in the Plan throughout the Class Period.  Under DOL regulations, retirement plan fiduciaries can designate one of the investment offerings in a plan's lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets.  If participants do not indicate where their assets should be invested, their contributions are automatically invested in the QDIA.  Like any other investment option, Plan fiduciaries are responsible for the prudent selection and continuous monitoring of an appropriate QDIA.  For this reason, it is vital for fiduciaries to understand the relevant plan participant population and ensure the QDIA is a suitable and prudent option.  Indeed, Plan

fiduciaries are responsible for the prudent selection and continuous monitoring of an appropriate QDIA.

35.    Given that the vast majority of Plan participants are not sophisticated investors, many, by default, concentrate their retirement assets in TDFs.  As such, the impact of Defendants' imprudent selection of TDFs is magnified vis-à-vis other asset categories.  Indeed, by December 31, 2020, approximately 23% of the Plan's assets were invested in the BlackRock TDFs.

i.    No TDF is a Passively Managed Investment

36.    The managers of "active" investment funds try to add value by outperforming a chosen segment of the market.  The Plan's IPS explicitly acknowledges this fact.  Accordingly, when assessing an active fund manager's performance, plan fiduciaries and investment professionals will scrutinize the impact of the manager's decisions and the outcomes such decisions produced, *i.e.*, the value added by the manager.  The IPS also espouses this approach. Conversely, "passive" fund managers merely seek to mimic the performance of a chosen segment of the market, typically a recognized market index.  Plan fiduciaries and investment professionals evaluate passive managers' ability to track the returns of their chosen market index by examining the fund's deviations from market index returns.  These two distinct investment management styles are thus judged through fundamentally different lenses.

37.    A TDF is a fund of funds.  While the component investment funds of a TDF portfolio may be actively or passively managed, or a combination of both, the asset allocation decisions made by the fund managers in setting and updating the TDF glide path are active management decisions.  Thus, it is well-understood in the investing industry and among

retirement plan professionals and fiduciaries that all TDFs are inherently actively managed.[9] The failure to acknowledge this well-established and widely-understood principle renders the Committee's evaluation of any TDF meaningless.  This fatal misconception was also articulated in the IPS, which misidentified the BlackRock TDFs as a passive investment.

38.     There is no market index for TDF managers to mimic or track when setting a TDF's glide path.  Accordingly, construction of a glide path involves substantial decision making from TDF managers.  Among these decisions is whether to fill the asset class bands in a glide path with active or passive funds (or a combination of both).  In industry parlance, the BlackRock TDFs are recognized as having "passive implementation" because the portfolio is populated with index funds.  Despite the fact that the BlackRock TDFs have a passive implementation but are not actually a passive investment option, the Plan's IPS categorized the BlackRock TDFs as a passive investment option.  At the same time, the Plan's IPS directed the Committee to ensure only that passive investments meet the results of their benchmark, while

---

[9]*See* Alliance Bernstein, Target-Date Retirement Funds: A Blueprint for Effective Portfolio Construction 52 (Oct. 2005), https://www.dol.gov/sites/dolgov/files/ebsa/laws-andregulations/rules-and-regulations/public-comments/target-date-fundshearing/supplementalmaterials1.pdf ("First, we would like to correct a common misconception: There is no such thing as a passively managed target-date retirement fund. Substantial active decisions are made during the construction of all such funds: which asset classes to use, how much to allocate to each asset class and how to manage each underlying asset class."); Jeff Holt, The $1 Trillion Target-Date Fund Landscape, Morningstar (May 7, 2018) https://www.morningstar.com/funds/1-trillion-target-date-fund-landscape ("no target-date series is truly passively managed, as every target-date manager makes active decisions in designing a glide path and selecting asset classes."); John Greves, Jake Gilliam, & Natallia Yazhova, Charles Schwab Investment Management, Passive Target Date Funds: Separating Myth From Reality 2 (2020) https://gravity.401kspecialistmag.com/wp-content/uploads/2020/11/TDF-11182020-CSIM-1.pdf ("The term "passive TDF" is also somewhat misleading. There is no such thing as a passive glide path design."); Jed Laskowitz, Passive Funds and "Do No Harm" Are Not Synonymous, Enterprising Investor (Sept. 15, 2021) https://blogs.cfainstitute.org/investor/2021/09/15/passive-funds-and-do-no-harm-are-notsynonymous/ ("it's important to remember there is no such thing as a passively managed TDF.").

simultaneously declaring comparison to a peer group inapplicable.  The Committee failed to appreciate the crucial distinction between a truly passive investment and the passive implementation of active asset allocation decisions, and thus fundamentally misunderstood the BlackRock TDFs to be passively managed.[10]

39.     Acting upon this misconception, the Committee only considered whether the BlackRock TDFs tracked the returns of their chosen index while minimizing deviations from those returns.  From the start of the Class Period, the quarterly reports provided to the Committee only compare the performance of the BlackRock TDFs to the BlackRock custom benchmark, a weighted mix of the benchmarks of the underlying portfolio funds.  Using this custom benchmark is akin to looking in a mirror, and provides no basis to conclude anything, positive or negative, about the BlackRock TDFs' performance, which, under the IPS, could be sufficiently poor as to itself require the suite's removal.  The solitary use of the custom benchmark was fatal to Defendants' investment monitoring process, as it rendered the Committee incapable of perceiving, much less considering or acting upon, the BlackRock TDFs' apparent and persistent underperformance.  Indeed, in mistaking an actively managed product for a passively managed product due to the portfolio's components, the Committee neglected to conduct any comparison of the BlackRock TDFs, the most important investment in the Plan, to a meaningful benchmark or peer universe, thereby ***failing to apply its own enumerated evaluative criteria***.

---

[10]The fiduciary duty of prudence is comprised of two complementary components: procedural prudence and substantive prudence.  But the presence of the former does not excuse the absence of the latter.  Substantive prudence requires a plan fiduciary to make a reasoned decision leading to an objectively appropriate result based on the information available.  In other words, investigation and evaluation do not excuse a rash or irrational decision.  Applied here, even if Defendants point to some basic markers of procedural prudence, the repeated decision to retain the BlackRock TDFs due to the illogical treatment of the BlackRock TDFs as index funds does not and cannot satisfy substantive prudence.  In other words, the nature of Defendants' breach of fiduciary duty is plain and established under applicable law.

40.     The BlackRock custom benchmark only evaluates BlackRock's implementation of its asset allocation strategy.  Its purpose is to reflect the funds' asset allocation shifts over time by reweighting the component indices quarterly to match the weighting of the BlackRock TDF portfolio.  In other words, the custom benchmark is simply a reflection of the TDF portfolio. Comparison between the two does not evaluate the investment performance of the BlackRock TDFs in any way, compared to either a relevant benchmark or appropriate peer group, as required by the Plan's own IPS.  Instead, comparing the BlackRock TDF portfolio to the custom benchmark shows only the portfolio's aggregate tracking error, which demonstrates how well a fund is tracking the returns of the index.  For the BlackRock TDFs, which are a fund of funds, the custom benchmark only indicates whether the underlying index funds are executing their respective mandates with regard to the index they are tracking.  Accordingly, the custom benchmark is a measure of execution, not performance.  But confirming that a TDF is functioning as intended is not the same as determining whether it can support an objective expectation of performance sufficient to justify its retention in the Plan and determination that it remains in the best interest of Plan participants.  In other words, Defendants utterly failed to monitor the actual performance of the BlackRock TDFs (by choosing, in essence, a meaningless benchmark with respect to performance) *in violation of the terms of the Plan's own IPS* and applicable law.  The Committee gained no insight into the performance of the BlackRock TDFs, or how their returns compare to those of available alternatives, by reviewing the custom benchmark.  This failure effectively prevented the Plan fiduciaries from conducting any meaningful ongoing monitoring of the performance of the BlackRock TDFs in accordance with the guidance established in the Plan's own IPS and as required by ERISA, and had no way to determine if the BlackRock TDFs were or were likely to become noncompliant with the

performance standards identified in the IPS, which were alone a sufficient basis for the Committee to remove the suite.

41.    The IPS establishes that actively managed funds should be evaluated against a universe of similar funds.  The prospectuses for the mutual fund versions of the BlackRock TDFs (which have the same investment strategy as the BlackRock TDFs in the Plan)[11] note that the series invests in a "portfolio of assets whose performance is expected to match approximately the performance of the Fund's custom benchmark index."  Despite the clear limitations of the custom benchmark as an evaluative tool, the Committee engaged in no regular and disciplined analysis or inquiry concerning the performance of the BlackRock TDFs relative to a TDF peer universe at any time during the Class Period.  It is not possible to confirm a TDF remains in the best interests of Plan participants by only confirming that the product is functioning as intended without regard to its characteristics, risk, and return relative to comparable investments. Therefore, the Committee was unable to recognize or track the BlackRock TDFs' consistent underperformance compared to available alternative TDFs on a rolling three- or five-year basis, which was sufficient under the Plan's IPS to cause the Committee to remove the BlackRock TDFs from the Plan's investment lineup.  Although past performance is not a sufficient predictor of future performance on its own, it is a necessary factor in any assessment of an investment's likelihood of future out- or underperformance.  Indeed, the Plan's IPS recognized this by identifying performance during the previous three- and five-year periods as key monitoring metrics.

---

[11]There are no prospectuses available for the CIT version of the BlackRock TDFs; however, the identical strategy of the CIT and mutual fund versions of the BlackRock TDFs renders the prospectuses for the mutual fund versions reliable for present purposes.

42.    The Committee's failure to consider in any way the outcomes realized by Plan participants who invested in the BlackRock TDFs rendered its monitoring process devoid of any mechanism to identify an investment that might have an expectation of underperforming comparable alternatives and, therefore, warrant removal under the direction of the Plan's IPS. The IPS advises the Committee to apply a heightened level of scrutiny to an investment that underperforms relative to its benchmark or peer group, and consider replacing the investment at such time that its future noncompliant performance is deemed likely.  Given that the returns of the BlackRock TDFs were not likely to underperform a benchmark they were "expected to match" (according to the funds' manager) and given that the TDFs' returns were not compared to any peer funds at any time during the Class Period, *it was not possible* for the BlackRock TDFs to be earmarked for further investigation, or indeed considered for removal, under the parameters established in the IPS.

i.        ii. The S&P Target Date Indices

43.    As an evaluative tool, prudent fiduciaries will assess a TDF's risk and return characteristics compared to the TDF industry at large.  Such practice is consistent with the instruction in the Plan's IPS to evaluate fund performance compared to a universe of similar managers.  According to Morningstar, the S&P Target Date Indices ("S&P Indices") are the most common benchmark used to approximate the performance of the TDF industry.  The S&P Indices, which include a separately calculated index for each target date, each "measure[] the performance of sub-indices selected and weighted to represent a consensus of the opportunity set available in the U.S. universe of target date funds."[7]  As a composite of the disparate strategies and styles present in the broad universe of investable alternative TDFs, the S&P Indices

---

[7] S&P Target Date Index Series Methodology (June 2022).

represent an appropriate, meaningful benchmark comparator for the BlackRock TDFs.  As each distinct TDF suite necessarily takes a different approach to the achieving the same objective (i.e., preparing investors for retirement by a particular date), the S&P Indices provide an amalgamation of the different characteristics of TDF strategies: TDFs with actively and passively managed underlying funds, TDFs with different risk profiles, and, to state the obvious, those with different asset allocations, as distinguishable TDF suites have varying mixes of stocks, bonds and cash.  Accordingly, the S&P Target Date Indices are the most widely used TDF benchmark by investment managers and informed retirement plan fiduciaries.

ii.     iii. The Comparator TDFs

44.     Measured against appropriate, available alternative TDFs, the BlackRock TDFs are a vastly inferior retirement solution that a prudent fiduciary could not have justifiably retained in the Plan, as the persistence of the suite's underperformance would have been flagged by any fiduciary appropriately understanding TDFs as actively managed investment products. Throughout the Class Period, there were many TDF offerings that consistently and dramatically outperformed the BlackRock TDFs, providing investors with substantially more capital appreciation.  Critically, at the time of Defendants' decisions to select and retain the BlackRock TDFs, those alternatives—unlike the BlackRock TDFs—supported a reasonable expectation of return to justify selection and retention in the Plan.  Accordingly, the Plan's investment in the BlackRock TDFs has resulted in participants missing out on millions of dollars in retirement savings growth that could have been achieved through an investment in any of the below alternative TDFs, and indeed many other options.

45.     Prudent fiduciaries evaluate TDF returns against an appropriate index, a broad group of all peer TDFs, and specific, readily investable alternatives, to ensure that participants

are benefiting from the current TDF offering.  In addition to consideration of broader benchmarks, it is incumbent on plan fiduciaries and a component of the standard of care applicable throughout the Class Period to assess TDFs against readily available prudent alternatives to ensure that participants are best served by the options available to them. Awareness of investible alternatives is even more important in relation to a plan's QDIA, given the gravitation of plan assets to the QDIA and importance of the QDIA to the overall design of a plan's investment menu.

46.    This is particularly important in the context of the TDF market.  Investment advisors considering investments for addition to a retirement plan lineup regularly apply initial screens that funds must pass in order to be considered for a plan, including requiring that candidate funds have sufficient assets under management ("AUM") such that the plan's assets would not represent a disproportionately large share of the fund's assets.

47.    The TDF market is particularly top heavy; by the end of 2021, the top six largest TDF series managed approximately three-quarters of all TDF assets.  Accordingly, most of the TDF suites available for investment would fail initial asset-level screening criteria applicable to the Plan.  Indeed, by the end of 2016, the Plan's approximately $1.3 billion in the BlackRock TDFs would represent less than 5% of the assets under management of only 6 available TDF series, or just 10% of options available in the TDF universe.  In light of the structure of the TDF marketplace and commonly used minimum AUM criteria, it would not be relevant to compare the BlackRock TDFs to TDF series with significantly smaller levels of AUM because the Plan could not responsibly invest in them (since its assets would account for too much of the AUM under normal and accepted investment principles).

48.   The largest six TDF series managed approximately three-quarters of all TDF

assets:

| Target Date Series | Mutual Fund ($B) | CIT ($B) | Total ($B) | Market Share |
|---|---|---|---|---|
| Vanguard Target Retirement | 660 | 530 | 1,190 | 36.4% |
| T. Rowe Price Retirement | 180 | 170 | 350 | 10.7% |
| BlackRock LifePath Index | 61 | 226 | 287 | 8.8% |
| American Funds Target Date Retirement | 239 | 9 | 248 | 7.6% |
| Fidelity Freedom | 221 | - | 221 | 6.8% |
| Fidelity Freedom Index | 106 | 46 | 152 | 4.6% |

49.   Accordingly, four of the five non-BlackRock suites shown above (the

"Comparator TDFs") represent an ideal group for comparison, as they represent the most likely

alternatives to be selected were the BlackRock TDFs to be replaced.[8]  In fact, the Comparator

TDFs represent the exact type of universe of similar funds against which the IPS requires non-

passively managed investments be evaluated.   It bears noting that hundreds of retirement plan

fiduciaries select a new TDF suite each year. Conducting a TDF replacement search is simply

not possible without measuring TDFs with different styles, strategies, risk profiles and asset.

50.   Defendants could have sought comparative returns data and other metrics for each

of the Comparator TDFs in real-time throughout the Class Period from the Plan's recordkeeper,

Fidelity Investments Institutional ("Fidelity"), Aon Hewitt, Financial Engines, or the Plan's other

service providers, or easily obtained it themselves through just a few clicks of a computer mouse.

---

[8]The other TDF suite in the largest six by market share during the relevant period was the
Fidelity Freedom Funds ("Freedom Funds"), which do not represent an appropriate comparator.
The Freedom Funds would have been an imprudent selection for the Plan for the duration of the
Class Period due to myriad quantitative and qualitative red flags after undergoing a strategy
overhaul in 2014.  As a result of these issues, the Freedom Funds lost considerable assets and
market share after their strategy overhaul in 2014.  Yet even the anemic and imprudent Freedom
Funds outperformed the BlackRock TDFs during the Class Period.  While the Freedom Funds
were not a suitable alternative for the Plan, a fiduciary applying the requisite scrutiny to the
BlackRock TDFs would have been aware of their underperformance compared to the Freedom
Funds, despite the issues plaguing the Freedom Funds.  This is even further confirmation of the
inability of the BlackRock TDFs to provide competitive returns throughout the Class Period.

When evaluated against the Comparator TDFs, both individually and as a group, the returns of the BlackRock TDFs, at all stages along the glide path from aggressive to conservative, paled in comparison to those of the readily available alternatives.  Such persistent underperformance should have been sufficient under the terms of the IPS to convince the Committee to remove the BlackRock TDFs for future noncompliance with its performance standards.  Had the Committee's ongoing review of the BlackRock TDFs not been fatally limited by its fundamental misunderstanding of the investment product, Defendants' adherence to the Plan's IPS should have yielded a similar conclusion.

51.    Any suggestion that it is inappropriate for fiduciaries to assess an investment suite holding over half the Plan's assets against specific available alternatives because "to" glide paths, like that of the BlackRock TDFs, adopt a more conservative approach is misleading. While the BlackRock TDFs de-risk at a quicker pace than most of the Comparator TDFs, the resulting equity allocation discrepancy is only reflected in its two most conservative vintages, the 2025 and Retirement TDFs.[9]  Indeed, the BlackRock TDF series has the industry's most aggressive glide path for investors furthest from retirement and maintains a comparable equity allocation to its peers until an investor is approaching retirement.[10]

---

[9]It necessarily follows that the percentage of assets in a TDF vintage which are not allocated to equities are in some combination of fixed income instruments and cash (with the latter appearing in TDF portfolios primarily as the retirement date approaches).  For example, when the table "Percentage of Portfolio in Equities" notes that the allocation of the BlackRock 2055 TDF is 97% equity, this means that 3% of the portfolio is allocated to a mix of bonds and cash.

[10]Current equity allocations were compiled from Vanguard Advisor's online "Compare Products" tool.  Where an equity allocation is blank, the TDF does not offer that respective vintage.  The equity allocation in the BlackRock TDFs' Retirement vintage is shown in the 2020 column.

| | Percentage of Portfolio in Equities | | | | | | | | | | | | |
| Target Year | 2065 | 2060 | 2055 | 2050 | 2045 | 2040 | 2035 | 2030 | 2025 | 2020 | 2015 | 2010 | 2005 | Retire |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Funds Trgt Date Retire | 85 | 85 | 85 | 85 | 84 | 81 | 71 | 59 | 50 | 45 | 42 | 39 | - | - |
| Fidelity Freedom Index | 90 | 90 | 90 | 90 | 90 | 89 | 77 | 62 | 56 | 49 | 40 | 30 | 21 | 19 |
| T. Rowe Price Retirement | 94 | 94 | 94 | 94 | 92 | 88 | 79 | 69 | 58 | 51 | 47 | 44 | 41 | - |
| Vanguard Target Retirement | 87 | 87 | 87 | 87 | 84 | 76 | 69 | 62 | 54 | 42 | 29 | - | - | 29 |
| BlackRock LifePath Index | 97 | 97 | 97 | 96 | 91 | 82 | 72 | 60 | 48 | 40 | - | - | - | - |
| Comparator TDF Average | 89 | 89 | 89 | 89 | 88 | 84 | 74 | 63 | 55 | 47 | | | | |
| BlackRock +/- Average | **8** | **8** | **8** | **7** | **4** | **-2** | **-2** | **-3** | **-7** | **-7** | | | | |

52.     The BlackRock TDFs are considerably more aggressive than the Comparator TDFs from the vintage intended for the youngest investors through those with a target retirement date of 2050.  For the 2045 through 2030 vintages, the latter of which is managed for investors currently within ten years of their anticipated retirement date, the difference in equity allocations between the BlackRock TDFs and the Comparator TDFs is negligible.  Though the BlackRock TDFs become considerably more conservative in the 2025 vintage and at retirement, each of the Comparator TDFs ultimately reach a terminal equity allocation that is at or below the 40% of the BlackRock TDFs.



iii.   iv. <u>Performance Comparisons</u>

53.     The contention that the performance of a "to," ostensibly more conservative, TDF cannot be compared to more aggressive series relies on the presumption that a considerably heavier weight to equities will likely produce greater returns, as compensation for the assumption of greater risk.  The industry-leading equity allocation of the longest-dated vintages of the BlackRock TDFs has refuted this notion consistently and dramatically throughout the Class Period.  The repeatedly inferior returns of the vintages serving young investors are matched by similar performance shortcomings across the BlackRock TDFs' glide path, as reflected in the three- and five-year annualized returns data[11] below comparing the performance of the BlackRock TDFs to that of the Comparator TDFs, as well as to the performance of the broader universe of TDFs, as represented by the S&P Indices.[12]  Again, this stark underperformance

---

[11]Virtually all competent investment advisors emphasize that fiduciaries should focus on three- and five-year returns to evaluate the performance of an investment over periods most closely approximating a market cycle and persistent poor performance over those periods demands investigation and action by fiduciaries.  Indeed, the IPS explicitly acknowledges that the Committee should review investment performance over a full market cycle of roughly three to five years.  Any suggestion that a TDF has a lifespan of 10 or 25 years and, therefore, performance metrics of three to five years should not be considered is nonsensical because (a) at any point in time, many vintages of TDFs have shorter lifespans than 10, and especially 25, years, and (b) most importantly, in light of employment mobility in the United States (with the average employee holding a position for slightly more than four years), competent and informed fiduciaries understand that many participants will not maintain their TDF investments within a defined contribution plan such as the Plan until the actual target date of the given investment.  Thus, three- and five-year performance is paramount in the minds of any competent fiduciary of a retirement plan.  This is confirmed by the language of the Plan's own IPS (even though it was apparently ignored by the Plan's fiduciaries during the Class Period).

[12]The only exception is the BlackRock Retirement TDF, which has regularly generated better trailing returns than the two Comparator TDFs that also offer a Retirement vintage (Fidelity Freedom Index and Vanguard Target Retirement).  But the outperformance of a single vintage does not exonerate the rest of the suite's putrid performance.  Indeed, TDFs are evaluated and selected as a single suite.  Moreover, as the BlackRock TDFs are a "to retirement" investment, they are managed with the expectation that investors will withdraw their assets from the Plan upon reaching the Retirement vintage or shortly thereafter.

would have been readily apparent to any fiduciary appropriately evaluating the BlackRock TDFs against peer funds and not solely a custom benchmark that the TDFs almost exactly mimic.

54.    The below performance data represent information that was easily accessible to Cisco during the Class Period and would have been reviewed by prudent fiduciaries. ***None of the below data were reviewed by the Committee at its meetings during the Class Period.*** Defendants could have sought these comparative returns data at any time from Fidelity in its capacity as recordkeeper (since Fidelity regularly provides such data to their customers), Aon Hewitt, Financial Engines, as well as from the Plan's other service providers, or, in the alternative, obtained it themselves in real time through just a few clicks of a computer mouse. At any point in the Class Period, such data would have been sufficient to convince a fiduciary following a prudent process (or the Plan's IPS) to investigate alternatives and ultimately replace the BlackRock TDFs.

55.    Prevailing standards dictate that fiduciaries of large retirement plans meet quarterly. Although the Committee met periodically, it failed to meet quarterly during the Class Period. The Committee's first meeting during the Class Period took place on October 13, 2016. Typically, retirement plan fiduciaries review and discuss the performance numbers available to them as of the most recent quarter-end prior to the meeting date. At its October 13, 2016 meeting, the Committee met to review data and information as of the end of the Second Quarter of 2016. The minutes of this meeting reflect ***no discussion*** of the performance of the BlackRock TDFs, even though the Blackrock TDFs were obviously the Plan's most important investment. No investment review is mentioned in the minutes of the October 13, 2016 meeting, indicating no monitoring of fund performance, in an appropriate manner or otherwise, occurred. As of the same date, however, the BlackRock TDFs' returns pursuant to the criteria established by the IPS

were decidedly worse than those of peer TDF suites, suggesting the need for heightened scrutiny of the suite under the direction of the IPS.  Had the Committee appropriately evaluated the inherently actively managed BlackRock TDFs against a peer group or universe of TDFs, the suite's marked underperformance should have been noted, discussed, and scrutinized.

56.     Indeed, as of the end of the Second Quarter of 2016, the entire BlackRock TDF suite, except for the Retirement vintage, trailed the corresponding S&P Indices on a three- and five-year basis, indicating the type of underperformance against a relevant peer universe that the IPS cautions should be grounds for dismissal of an investment should the situation not improve. Further, the prevailing standard of care for investment monitoring demands awareness and consideration of *rolling* performance to identify trends of out- or underperformance.  While underperformance over a single three- or five-year period is a cause for concern and scrutiny, prudent fiduciaries will seek to understand the reasons for the underperformance and closely monitor the investment to see if it subsequently outperforms.[12]  Underperformance over several consecutive three- or five-year trailing periods, however, is a cause for both alarm and action. Due to its fundamental misunderstanding of the BlackRock TDFs as an investment product, the Committee never considered or reviewed the BlackRock TDFs' inability to generate returns above those of their peers, as represented by the S&P Indices, over three- and five-year periods dating back to at least the Second Quarter of 2014.  In fact, the Committee's misconception of the BlackRock TDFs rendered it unable to perceive, much less discuss, the suite's lagging returns relative to its peers when it met to review the Second Quarter of 2014, Third Quarter of 2014, Fourth Quarter of 2014, First Quarter of 2015, Second Quarter of 2015, Third Quarter of

---

[12]It should be noted that "improved" or lessening underperformance over time is still just that: underperformance.  A fund manager that persistently fails to outperform, however great or slight the underperformance, persistently fails to add value.

2015, Fourth Quarter of 2015, and the First Quarter of 2016.  Had it been engaged in an appropriate ongoing review of the BlackRock TDFs, the Committee would have been aware at its October 13, 2016 meeting of the performance shortcomings visible at each of the previous quarterly meetings, which presented compelling information requiring a serious and deliberate decision as to whether there was any basis to retain the Blackrock TDFs, as required under the IPS.  Sustained underperformance is the clearest indication of a manager's inability to provide value, which is why the IPS focuses on those criteria.

57.     Such a dismal trend should have been a strong indicator to the Committee of the BlackRock TDFs' unsuitability for the Plan, and accordingly sufficient reason for the Committee to investigate alternative TDFs.  The suite's consistent underperformance against the Comparator TDFs served as further confirmation of the BlackRock TDFs' inferiority.  The entire suite,[13] bar the Retirement vintage, ranked in the bottom half among the Comparator TDFs.  Retirement plan fiduciaries prudently monitoring the BlackRock TDFs would have considered and noted the underperformance against each of BlackRock's closest competitors, reflected in the tables below.

58.     To the extent Defendants' vendors, including Aon Hewitt, failed to note concerns with the Plan's investments, the Committee undertook no effort to validate or inquire about the BlackRock TDFs despite knowable failures of the monitoring criteria established in the IPS ratified by Defendants on behalf of the Plan.

59.     Had the Committee been consistently and appropriately monitoring the BlackRock TDFs' performance against a universe of peer funds as dictated by the Plan's own IPS, it would have had no justifiable basis to retain the BlackRock TDFs even as of the start of

---

[13]The BlackRock 2060 TDF did not have a three-year track record until the Fourth Quarter of 2017.  The BlackRock 2065 TDF did not launch until September 2019.

the Class Period. The below tables represent all of the aforementioned metrics available to the Committee had it appropriately reviewed the performance of the BlackRock TDFs as of the end of the Second Quarter of 2016.[14]

| 3-Year Return as of 2Q16 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.52 | 5.80 | 6.06 | 6.22 | 6.39 | 6.59 | 6.80 | 7.00 |
| Outperformance vs S&P TDF Index | (1.21) | (1.21) | (1.31) | (1.37) | (1.38) | (1.27) | (1.24) | (1.13) |
| Best Performing Comparator TDF | 7.57 | 8.29 | 8.62 | 8.59 | 8.61 | 8.63 | 8.65 | 8.61 |
| Worst Performing Comparator TDF | 5.54 | 6.26 | 6.42 | 6.71 | 6.75 | 6.82 | 6.89 | 6.98 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | 4 |

| 5-Year Return as of 2Q16 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.39 | 5.69 | 5.96 | 6.17 | 6.34 | 6.52 | 6.70 | 6.97 |
| Outperformance vs S&P TDF Index | (0.70) | (0.71) | (0.76) | (0.80) | (0.81) | (0.77) | (0.74) | (0.62) |
| Best Performing Comparator TDF | 7.64 | 8.45 | 8.75 | 8.69 | 8.73 | 8.73 | 8.74 | 8.74 |
| Worst Performing Comparator TDF | 5.08 | 5.75 | 5.88 | 6.18 | 6.23 | 6.29 | 6.28 | 6.41 |
| BlackRock Rank (out of 5) | 4 | Last | 4 | Last | 4 | 4 | 4 | 4 |

- The Committee met on December 22, 2016 to review the Plan's investment results as of the end of the Third Quarter of 2016. A fiduciary monitoring the BlackRock TDFs in a manner consistent with the Plan's IPS would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe performance issues compared to the Comparator TDFs and the S&P Indices. *No discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 3Q16 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.07 | 5.33 | 5.56 | 5.74 | 5.91 | 6.08 | 6.20 | 6.30 |
| Outperformance vs S&P TDF Index | (0.68) | (0.68) | (0.74) | (0.85) | (0.86) | (0.79) | (0.74) | (0.63) |
| Best Performing Comparator TDF | 6.67 | 7.11 | 7.55 | 7.67 | 7.70 | 7.75 | 7.77 | 7.75 |
| Worst Performing Comparator TDF | 5.26 | 5.81 | 6.12 | 6.35 | 6.36 | 6.39 | 6.42 | 6.45 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

---

[14]For avoidance of confusion, the figures in the "Outperformance vs S&P TDF Index" row represent the BlackRock TDF's out- or underperformance of the corresponding vintage of the S&P Indices. A red number indicates the annualized amount by which the BlackRock TDF underperformed its S&P counterpart.

| 5-Year Return as of 3Q16 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 7.72 | 8.54 | 9.24 | 9.87 | 10.44 | 10.95 | 11.44 | 11.86 |
| Outperformance vs S&P TDF Index | (1.33) | (1.29) | (1.33) | (1.26) | (1.11) | (0.92) | (0.70) | (0.47) |
| Best Performing Comparator TDF | 10.65 | 12.01 | 12.76 | 12.91 | 13.07 | 13.11 | 13.13 | 13.13 |
| Worst Performing Comparator TDF | 7.65 | 8.81 | 9.25 | 10.13 | 10.22 | 10.36 | 10.53 | 10.73 |
| BlackRock Rank (out of 5) | 4 | Last | Last | Last | 4 | 4 | 4 | 4 |

- The Committee met on February 27, 2017 to review the Plan's investment results as of the end of the Fourth Quarter of 2016. A fiduciary prudently monitoring the BlackRock TDFs would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe performance issues compared to the Comparator TDFs and the S&P Indices. *No discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 4Q16 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 3.68 | 3.88 | 4.05 | 4.19 | 4.30 | 4.38 | 4.41 | 4.41 |
| Outperformance vs S&P TDF Index | (0.50) | (0.44) | (0.44) | (0.47) | (0.46) | (0.45) | (0.50) | (0.51) |
| Best Performing Comparator TDF | 4.61 | 4.67 | 5.03 | 5.15 | 5.19 | 5.28 | 5.28 | 5.26 |
| Worst Performing Comparator TDF | 3.96 | 4.23 | 4.52 | 4.56 | 4.61 | 4.62 | 4.65 | 4.64 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 4Q16 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 6.45 | 7.19 | 7.84 | 8.45 | 8.94 | 9.42 | 9.82 | 10.16 |
| Outperformance vs S&P TDF Index | (1.22) | (1.19) | (1.20) | (1.15) | (1.06) | (0.89) | (0.78) | (0.66) |
| Best Performing Comparator TDF | 8.96 | 10.40 | 11.14 | 11.31 | 11.46 | 11.51 | 11.52 | 11.50 |
| Worst Performing Comparator TDF | 6.55 | 7.59 | 8.12 | 8.94 | 9.02 | 9.16 | 9.26 | 9.45 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | 4 | 4 | 4 |

- The Committee *did not meet* to review the Plan's investment results as of the end of the First Quarter of 2017. A fiduciary prudently monitoring the BlackRock TDFs would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe performance issues compared to the Comparator TDFs and the S&P Indices.

| 3-Year Return as of 1Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 4.09 | 4.48 | 4.83 | 5.14 | 5.40 | 5.56 | 5.62 | 5.62 |
| Outperformance vs S&P TDF Index | (0.80) | (0.68) | (0.63) | (0.61) | (0.54) | (0.53) | (0.63) | (0.71) |
| Best Performing Comparator TDF | 5.37 | 5.72 | 6.38 | 6.73 | 6.84 | 6.99 | 7.01 | 7.00 |
| Worst Performing Comparator TDF | 4.78 | 5.14 | 5.72 | 5.95 | 6.14 | 6.17 | 6.20 | 6.17 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 1Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.76 | 6.42 | 7.01 | 7.56 | 8.01 | 8.40 | 8.68 | 8.92 |
| Outperformance vs S&P TDF Index | (1.06) | (1.00) | (0.98) | (0.94) | (0.85) | (0.75) | (0.77) | (0.79) |
| Best Performing Comparator TDF | 8.21 | 9.36 | 10.13 | 10.43 | 10.59 | 10.67 | 10.69 | 10.66 |
| Worst Performing Comparator TDF | 6.04 | 6.91 | 7.56 | 8.27 | 8.33 | 8.42 | 8.46 | 8.61 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | 4 | 4 |

60.    At this point, Defendants should have reviewed at least four consecutive quarters of deplorable three- and five-year returns by the BlackRock TDFs when measured against appropriate peer funds and the broader TDF industry.  These strong indicators of the imprudence of the continued retention of the BlackRock TDFs should have been sufficient to convince Defendants to investigate a replacement, consistent with the guidance in the IPS that persistent underperformance against a benchmark or peer group was sufficient cause for further scrutiny of a fund's continued appropriateness for the Plan.[15]  Either trend of underperformance alone should have raised alarm bells for prudent fiduciaries, as was prescribed in the IPS.  That both red flags were present here, but were ignored, demonstrates that Defendant's misconception of TDFs was fatal to its continued review of the suitability of the BlackRock TDFs for the Plan.  Defendants allowed the suite to remain in the Plan even as its performance issues persisted:

- The Committee met on October 20, 2017 to review the Plan's investment results as of the end of the Second Quarter of 2017.  A fiduciary prudently monitoring the BlackRock TDFs would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe performance issues compared to the Comparator TDFs and the S&P Indices.  The continued peer-relative underperformance of the BlackRock TDFs was ignored once more by the Committee, and is ***not mentioned*** at all in the meeting minutes.

[15]Four quarters of trailing three- or five-year returns is distinct from four quarters of returns. Plaintiffs note, for example, four consecutive quarters of trailing five-year underperformance to show that, were the Committee meeting on a regular, quarterly basis, it would have reviewed five-year underperformance at four straight separate meetings.  Any trailing three- or five-year underperformance as of a single quarter end is worth a fiduciary's attention; trends such as those detailed in this Complaint are cause for considerable concern.

| 3-Year Return as of 2Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 3.67 | 4.08 | 4.45 | 4.79 | 5.07 | 5.23 | 5.25 | 5.19 |
| Outperformance vs S&P TDF Index | (0.91) | (0.78) | (0.71) | (0.68) | (0.59) | (0.58) | (0.71) | (0.84) |
| Best Performing Comparator TDF | 5.10 | 5.57 | 6.08 | 6.57 | 6.69 | 6.85 | 6.87 | 6.86 |
| Worst Performing Comparator TDF | 4.41 | 4.73 | 5.35 | 5.66 | 5.83 | 5.82 | 5.85 | 5.80 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 2Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 6.51 | 7.34 | 8.08 | 8.76 | 9.36 | 9.87 | 10.24 | 10.54 |
| Outperformance vs S&P TDF Index | (1.40) | (1.33) | (1.33) | (1.27) | (1.12) | (0.96) | (0.92) | (0.87) |
| Best Performing Comparator TDF | 9.27 | 10.47 | 11.42 | 11.85 | 12.07 | 12.16 | 12.16 | 12.16 |
| Worst Performing Comparator TDF | 6.96 | 8.01 | 8.77 | 9.73 | 9.82 | 9.93 | 10.01 | 10.19 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | 4 | 4 |

- The Committee met on January 26, 2018 to review the Plan's investment results as of the end of the Third Quarter of 2017. A fiduciary prudently monitoring the BlackRock TDFs would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe performance issues compared to the Comparator TDFs and the S&P Indices. The minutes note that Aon Hewitt had no concerns about investment performance in comparison to benchmarks or peer funds, highlighting the misclassification of the BlackRock TDFs that rendered the Committee's evaluation useless. Despite the substantial historic performance issues, the minutes do not note any questions or inquiry made by the Committee in response to Aon Hewitt's assessment.

| 3-Year Return as of 3Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.14 | 5.77 | 6.34 | 6.85 | 7.30 | 7.57 | 7.67 | 7.68 |
| Outperformance vs S&P TDF Index | (0.90) | (0.79) | (0.74) | (0.72) | (0.60) | (0.57) | (0.68) | (0.78) |
| Best Performing Comparator TDF | 6.83 | 7.46 | 8.03 | 8.61 | 8.85 | 9.01 | 9.05 | 9.05 |
| Worst Performing Comparator TDF | 5.92 | 6.38 | 7.19 | 7.61 | 7.97 | 8.02 | 8.06 | 8.02 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

| 3-Year Return as of 3Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.14 | 5.77 | 6.34 | 6.85 | 7.30 | 7.57 | 7.67 | 7.68 |
| Outperformance vs S&P TDF Index | (0.90) | (0.79) | (0.74) | (0.72) | (0.60) | (0.57) | (0.68) | (0.78) |
| Best Performing Comparator TDF | 6.83 | 7.46 | 8.03 | 8.61 | 8.85 | 9.01 | 9.05 | 9.05 |
| Worst Performing Comparator TDF | 5.92 | 6.38 | 7.19 | 7.61 | 7.97 | 8.02 | 8.06 | 8.02 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

- The Committee **did not meet** to review the Plan's investment results as of the end of the Fourth Quarter of 2017. A fiduciary prudently monitoring the BlackRock TDFs would have observed a continuation of the trend identified above, as the

BlackRock TDFs continued to exhibit severe performance issues compared to the Comparator TDFs and the S&P Indices.

| 3-Year Return as of 4Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.66 | 6.48 | 7.21 | 7.89 | 8.48 | 8.85 | 8.97 | 8.96 | 8.96 |
| Outperformance vs S&P TDF Index | (0.82) | (0.72) | (0.66) | (0.62) | (0.47) | (0.39) | (0.52) | (0.66) | (0.74) |
| Best Performing Comparator TDF | 7.41 | 8.11 | 8.75 | 9.56 | 9.89 | 10.09 | 10.16 | 10.15 | 9.68 |
| Worst Performing Comparator TDF | 6.55 | 7.07 | 7.85 | 8.39 | 8.91 | 9.14 | 9.16 | 9.11 | 9.10 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | 4 |

| 5-Year Return as of 4Q17 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 6.58 | 7.51 | 8.32 | 9.09 | 9.75 | 10.28 | 10.61 | 10.82 |
| Outperformance vs S&P TDF Index | (1.34) | (1.25) | (1.25) | (1.20) | (1.04) | (0.87) | (0.87) | (0.88) |
| Best Performing Comparator TDF | 9.09 | 10.36 | 11.50 | 12.13 | 12.45 | 12.57 | 12.62 | 12.60 |
| Worst Performing Comparator TDF | 7.30 | 8.29 | 9.30 | 10.36 | 10.46 | 10.54 | 10.60 | 10.74 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | 4 | 4 |

- The Committee met on June 1, 2018 to review the Plan's investment results as of the end of the First Quarter of 2018. A fiduciary prudently monitoring the BlackRock TDFs would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe performance issues compared to the Comparator TDFs and the S&P Indices. The continued peer-relative underperformance of the BlackRock TDFs was ignored once more by the Committee, and is ***not mentioned*** at all in the meeting minutes.

| 3-Year Return as of 1Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 4.63 | 5.37 | 6.03 | 6.65 | 7.17 | 7.49 | 7.60 | 7.59 | 7.59 |
| Outperformance vs S&P TDF Index | (0.70) | (0.64) | (0.59) | (0.56) | (0.44) | (0.39) | (0.51) | (0.65) | (0.73) |
| Best Performing Comparator TDF | 6.50 | 7.12 | 7.86 | 8.86 | 9.20 | 9.41 | 9.53 | 9.51 | 9.49 |
| Worst Performing Comparator TDF | 5.62 | 6.06 | 6.83 | 7.35 | 7.86 | 8.10 | 8.11 | 8.05 | 8.06 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 1Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.51 | 6.30 | 6.99 | 7.63 | 8.18 | 8.62 | 8.84 | 8.98 |
| Outperformance vs S&P TDF Index | (1.12) | (1.04) | (1.03) | (1.01) | (0.89) | (0.76) | (0.83) | (0.88) |
| Best Performing Comparator TDF | 7.92 | 8.83 | 9.94 | 10.63 | 10.93 | 11.07 | 11.12 | 11.12 |
| Worst Performing Comparator TDF | 6.31 | 7.12 | 8.07 | 8.97 | 9.04 | 9.09 | 9.14 | 9.21 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

61.    At this point, consistent with its regular monitoring duties, the Committee should have reviewed at least eight consecutive quarters demonstrating the BlackRock TDFs'

-32-

persistent inability to beat the three- and five-year returns generated by the Comparator TDFs and the broader TDF industry.  That is, from the start of the Class Period, the BlackRock TDFs had failed to generate returns to beat the Comparator TDFs or the S&P Indices for *eight consecutive* three-year periods and *eight consecutive* five-year periods.  The Committee's confounding refusal to replace the suite by this juncture, despite its clear and apparent noncompliance with the IPS standards, represented a severe breach of fiduciary duty.  These issues endured:

- The Committee met on September 21, 2018 to review the Plan's investment results as of the end of the Second Quarter of 2018.  A fiduciary prudently monitoring the BlackRock TDFs would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe performance issues compared to the Comparator TDFs and the S&P Indices.  *No discussion or mention* of the BlackRock TDFs' returns specifically is reflected in the meeting minutes.

| 3-Year Return as of 2Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.10 | 5.89 | 6.60 | 7.26 | 7.83 | 8.19 | 8.32 | 8.30 | 8.31 |
| Outperformance vs S&P TDF Index | (0.80) | (0.70) | (0.63) | (0.57) | (0.43) | (0.32) | (0.43) | (0.56) | (0.66) |
| Best Performing Comparator TDF | 6.64 | 7.27 | 8.16 | 9.19 | 9.56 | 9.76 | 9.88 | 9.90 | 9.89 |
| Worst Performing Comparator TDF | 6.04 | 6.49 | 7.19 | 7.66 | 8.14 | 8.40 | 8.40 | 8.37 | 8.37 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 2Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.99 | 6.77 | 7.47 | 8.10 | 8.66 | 9.07 | 9.28 | 9.40 |
| Outperformance vs S&P TDF Index | (0.93) | (0.83) | (0.79) | (0.78) | (0.64) | (0.53) | (0.61) | (0.66) |
| Best Performing Comparator TDF | 8.06 | 8.89 | 9.86 | 10.61 | 10.91 | 11.06 | 11.15 | 11.12 |
| Worst Performing Comparator TDF | 6.79 | 7.58 | 8.54 | 9.31 | 9.49 | 9.53 | 9.58 | 9.64 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

- The Committee met on December 18, 2018 to review the Plan's investment results as of the end of the Third Quarter of 2018.  A fiduciary prudently monitoring the BlackRock TDFs would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe performance issues compared to the Comparator TDFs and the S&P Indices.  *No discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 3Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 7.27 | 8.60 | 9.80 | 10.95 | 11.94 | 12.55 | 12.74 | 12.72 | 12.70 |
| Outperformance vs S&P TDF Index | (1.09) | (0.85) | (0.67) | (0.49) | (0.16) | 0.01 | (0.19) | (0.40) | (0.64) |
| Best Performing Comparator TDF | 9.61 | 10.59 | 11.56 | 13.05 | 13.45 | 13.76 | 13.91 | 13.91 | 13.87 |
| Worst Performing Comparator TDF | 8.40 | 9.70 | 10.66 | 11.61 | 12.54 | 12.91 | 12.90 | 12.89 | 12.89 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 3Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.58 | 6.34 | 7.02 | 7.64 | 8.20 | 8.59 | 8.75 | 8.81 |
| Outperformance vs S&P TDF Index | (0.91) | (0.79) | (0.76) | (0.75) | (0.59) | (0.46) | (0.55) | (0.61) |
| Best Performing Comparator TDF | 7.32 | 8.01 | 8.98 | 9.79 | 10.08 | 10.26 | 10.35 | 10.32 |
| Worst Performing Comparator TDF | 6.55 | 7.24 | 8.13 | 8.69 | 9.17 | 9.26 | 9.28 | 9.30 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

- The Committee met on February 8, 2019 to review the Plan's investment results as of the end of the Fourth Quarter of 2018. A fiduciary prudently monitoring the BlackRock TDFs would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe performance issues compared to the Comparator TDFs and the S&P Indices. *No discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 4Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 4.71 | 5.23 | 5.70 | 6.14 | 6.51 | 6.69 | 6.72 | 6.70 | 6.69 |
| Outperformance vs S&P TDF Index | (0.33) | (0.24) | (0.08) | 0.06 | 0.18 | 0.18 | 0.04 | (0.12) | (0.26) |
| Best Performing Comparator TDF | 5.72 | 6.12 | 6.92 | 7.43 | 7.62 | 7.77 | 7.83 | 7.81 | 7.81 |
| Worst Performing Comparator TDF | 5.32 | 5.73 | 6.07 | 6.41 | 6.75 | 6.78 | 6.77 | 6.77 | 6.75 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 4Q18 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 3.70 | 4.00 | 4.27 | 4.51 | 4.70 | 4.80 | 4.82 | 4.81 |
| Outperformance vs S&P TDF Index | (0.40) | (0.32) | (0.24) | (0.18) | (0.12) | (0.11) | (0.19) | (0.26) |
| Best Performing Comparator TDF | 4.69 | 5.00 | 5.63 | 5.95 | 6.05 | 6.17 | 6.19 | 6.17 |
| Worst Performing Comparator TDF | 4.24 | 4.50 | 4.82 | 4.99 | 5.10 | 5.13 | 5.12 | 5.10 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

- The Committee met on June 4, 2019 to review the Plan's investment results as of the end of the First Quarter of 2019. A fiduciary prudently monitoring the BlackRock TDFs would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe performance issues compared to the Comparator TDFs and the S&P Indices. *No discussion or mention* of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 1Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 6.36 | 7.38 | 8.28 | 9.14 | 9.89 | 10.34 | 10.48 | 10.47 | 10.45 |
| Outperformance vs S&P TDF Index | (0.61) | (0.37) | (0.16) | 0.04 | 0.33 | 0.48 | 0.36 | 0.18 | (0.03) |
| Best Performing Comparator TDF | 8.24 | 9.05 | 9.79 | 10.88 | 11.28 | 11.50 | 11.62 | 11.62 | 11.58 |
| Worst Performing Comparator TDF | 7.12 | 8.18 | 8.87 | 9.52 | 10.20 | 10.43 | 10.43 | 10.43 | 10.42 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | 4 | 4 | 4 |

| 5-Year Return as of 1Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 4.70 | 5.26 | 5.75 | 6.19 | 6.57 | 6.80 | 6.89 | 6.88 |
| Outperformance vs S&P TDF Index | (0.57) | (0.40) | (0.31) | (0.22) | (0.09) | (0.00) | (0.07) | (0.14) |
| Best Performing Comparator TDF | 5.93 | 6.41 | 7.12 | 7.77 | 7.98 | 8.12 | 8.19 | 8.18 |
| Worst Performing Comparator TDF | 5.54 | 5.92 | 6.39 | 6.69 | 6.96 | 7.08 | 7.08 | 7.05 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

- The Committee met on October 11, 2019 to review the Plan's investment results as of the end of the Second Quarter of 2019. A fiduciary prudently monitoring the BlackRock TDFs would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe performance issues compared to the Comparator TDFs and the S&P Indices. ***No discussion or mention*** of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 2Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 6.65 | 7.69 | 8.61 | 9.48 | 10.24 | 10.68 | 10.82 | 10.81 | 10.80 |
| Outperformance vs S&P TDF Index | (0.63) | (0.40) | (0.22) | (0.02) | 0.23 | 0.36 | 0.21 | 0.01 | (0.21) |
| Best Performing Comparator TDF | 8.75 | 9.67 | 10.51 | 11.37 | 11.69 | 11.83 | 11.95 | 11.92 | 11.90 |
| Worst Performing Comparator TDF | 7.27 | 8.39 | 9.39 | 10.09 | 10.79 | 11.05 | 11.03 | 11.04 | 11.03 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 2Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 4.63 | 5.14 | 5.58 | 5.99 | 6.33 | 6.52 | 6.57 | 6.53 |
| Outperformance vs S&P TDF Index | (0.52) | (0.39) | (0.31) | (0.25) | (0.14) | (0.08) | (0.16) | (0.26) |
| Best Performing Comparator TDF | 5.79 | 6.26 | 6.90 | 7.54 | 7.74 | 7.90 | 7.97 | 7.94 |
| Worst Performing Comparator TDF | 5.48 | 5.82 | 6.22 | 6.48 | 6.72 | 6.86 | 6.85 | 6.82 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

- The Committee met on January 21, 2020 to review the Plan's investment results as of the end of the Third Quarter of 2019. A fiduciary prudently monitoring the BlackRock TDFs would have observed a continuation of the trend identified above, as the BlackRock TDFs continued to exhibit severe performance issues

compared to the Comparator TDFs. ***No discussion or mention*** of the BlackRock TDFs' returns is reflected in the meeting minutes.

| 3-Year Return as of 3Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 | 2060 |
|---|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 6.25 | 7.05 | 7.74 | 8.40 | 8.96 | 9.28 | 9.37 | 9.37 | 9.35 |
| Outperformance vs S&P TDF Index | (0.47) | (0.31) | (0.19) | (0.06) | 0.13 | 0.21 | 0.08 | (0.06) | (0.26) |
| Best Performing Comparator TDF | 7.59 | 8.28 | 9.22 | 10.04 | 10.04 | 10.12 | 10.21 | 10.19 | 10.16 |
| Worst Performing Comparator TDF | 6.66 | 7.52 | 8.29 | 8.78 | 9.28 | 9.41 | 9.42 | 9.41 | 9.41 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last | Last |

| 5-Year Return as of 3Q19 | 2020 | 2025 | 2030 | 2035 | 2040 | 2045 | 2050 | 2055 |
|---|---|---|---|---|---|---|---|---|
| BlackRock TDF | 5.22 | 5.73 | 6.16 | 6.56 | 6.90 | 7.09 | 7.15 | 7.15 |
| Outperformance vs S&P TDF Index | (0.47) | (0.37) | (0.31) | (0.26) | (0.17) | (0.12) | (0.19) | (0.26) |
| Best Performing Comparator TDF | 6.27 | 6.74 | 7.16 | 7.75 | 7.95 | 8.09 | 8.14 | 8.13 |
| Worst Performing Comparator TDF | 5.80 | 6.33 | 6.67 | 6.92 | 7.15 | 7.23 | 7.24 | 7.21 |
| BlackRock Rank (out of 5) | Last | Last | Last | Last | Last | Last | Last | Last |

62.    By this point, consistent with its regular monitoring duties, beginning with the start of the Class Period, the Committee should have reviewed at least *three and a half years'* worth of concerning and severely disappointing datapoints (and many more datapoints prior to the Class Period) laying bare the inability of the BlackRock TDFs to generate returns that beat any of the comparators discussed in this complaint, which should have been more than sufficient to convince a fiduciary adhering to the instructions laid out in the Plan's IPS that the BlackRock TDFs were no longer appropriate for inclusion in the Plan investment menu. The Committee's continued refusal to act in response to these blatant warning signs represented a bewildering miscarriage of its fiduciary duties.

63.    Although the relative performance of the BlackRock TDFs exhibited some modest improvements in subsequent quarters, those improvements were immaterial and did not negate or diminish the profound breaches of fiduciary duty Defendant committed in retaining the suite in the face of overwhelming and consistent evidence that it could not provide superior returns to the Comparator TDFs or the broader TDF market as represented by the S&P Indices.

Nor did those minor improvements make up for Plan participants' loss of tens of millions of dollars in potential capital appreciation. Any suggestion that the performance of the BlackRock TDFs marginally improved in the later part of the Class Period cannot excuse the Committee's abject failure to monitor the performance of the BlackRock TDFs in a manner consistent with the IPS. To do so would inappropriately exonerate a breach through hindsight analysis. Moreover, the BlackRock TDFs continued to dramatically and repeatedly underperform the average return of the Comparator TDFs for virtually the entire relevant period, as demonstrated in the charts below comparing the three- and five-year annualized returns of several representative vintages of the BlackRock TDFs to those of the same iterations of the Comparator TDFs, namely the 2025, 2040, and 2055 TDFs, which are the second-shortest dated (2025) and second-longest dated (2055) BlackRock TDFs, as well as the fund that represents the midpoint of the nine vintages for which there were at least three-year trailing returns (2040). These three vintages represent conservative, moderate and aggressive stages along the BlackRock TDF glidepath and are representative of the shortcomings of the entire suite.





64.      These returns, and all returns cited in this Complaint, are annualized, meaning the

differences in the returns between the BlackRock TDFs and Comparator TDFs are equivalent to

the specified difference in *each* of the three or five years in the period *compounded*.  This is not

the same as saying the funds underperformed by the specified amount over the entire time

period.  These are persistent and substantial shortcomings that could not have supported a

determination by prudent fiduciaries that the BlackRock TDFs could be justifiably retained in the

Plan, particularly not fiduciaries instructed to consider those very deficiencies in determining

whether an investment remained in compliance with the standards enumerated in the Plan's IPS.

Indeed, from the start of the Class Period through the filing of the complaint initiating this action,

the BlackRock TDFs *cumulatively* underperformed each of the comparator TDFs (on a Plan-

asset weighted basis) by the below amounts which, applied to the considerable amount of Plan

assets in the suite, resulted in the loss of dozens of millions in missed capital appreciation for the

retirement savings of Plan participants:

-39-

| | |
|---|---|
| BlackRock Cumulative Underperformance vs American Funds | 11.01% |
| BlackRock Cumulative Underperformance vs Freedom Index Funds | 4.46% |
| BlackRock Cumulative Underperformance vs T. Rowe Price | 7.23% |
| BlackRock Cumulative Underperformance vs Vanguard | 1.81% |

65.     Again, the above information was readily available to Defendants in real time throughout the relevant period.  Defendants, however, neglected to undertake any analysis of the BlackRock TDFs against appropriate peers using the above or other important performance metrics due to a fatal misunderstanding of the suite's management characteristics.  If Defendants had taken their fiduciary duties seriously during the Class Period and adhered to the IPS guidance, they would have replaced the BlackRock TDFs with a suitable alternative TDF.  Their failure to do so caused Plan participants to miss out on substantial investment returns for their retirement savings.

66.     The consistently deplorable performance of the BlackRock TDFs was also visible at the suite level throughout the pertinent period.  The below charts demonstrate the rolling out- or underperformance of the BlackRock TDFs versus each of the Comparator TDFs, weighting the returns of each distinct vintage equally to produce an aggregate suite-level return, another form of TDF analysis regularly undertaken by all investment advisors and competent fiduciaries.

BlackRock Rolling Returns vs American Funds





BlackRock Rolling Returns vs Fidelity Freedom Index





BlackRock Rolling Returns vs T. Rowe Price





BlackRock Rolling Returns vs Vanguard





67.     The returns of each vintage of a TDF suite, however, are not experienced by a Plan in equal measure, as Plan assets are distributed in different quantities across the glide path depending on a multitude of Plan specific factors.  Accordingly, prudent fiduciaries will perform

the same analysis as set forth above to compare aggregate suite-level returns that are asset-weighted.[16]

BlackRock Rolling Returns vs American Funds





---

[16]Returns are weighted according to the asset levels invested in each vintage of the BlackRock TDFs at the start of the Class Period. For example, if the Plan had $100 million in total assets in the BlackRock TDFs, $10 million of which was invested in the 2030 vintage, the returns of the 2030 vintage would be given a 10% weight in the performance composite.

<u>BlackRock Rolling Returns vs Fidelity Freedom Index</u>





BlackRock Rolling Returns vs T. Rowe Price





BlackRock Rolling Returns vs Vanguard





68.    Defendants had immediate access to historical and then-current returns data for the BlackRock TDFs, and could have sought comparative data from Fidelity, Aon Hewitt, Financial Engines and/or the Plan's other service providers, or obtained it themselves in real time through just a few clicks of a computer mouse.

69.     The troubling pattern identified above, which persisted for the entire Class Period, was ignored by Defendants, who neglected to appropriately scrutinize the BlackRock TDFs against any of the many superior TDFs available in the market, or the broader TDF market as a whole.  In fact, notwithstanding the warning signs detailed above, the minutes of meetings of the Committee from October 13, 2016 through August 24, 2022 do not reflect a single instance where the Committee so much as independently discussed the performance woes of the BlackRock TDFs.

70.     The knowable facts about Defendants' fiduciary process, including the Committee's failure to meet quarterly as dictated by prevailing standards, consistent failure to recognize, investigate, and remedy repeated failures of the only material investment monitoring criteria adopted in the Plan's own IPS, and failure to make further inquiries of its advisor when presented with insufficient investment monitoring information, each support the inescapable inference that Defendants' fiduciary process was inadequate.

71.     Had Defendants taken their fiduciary duties seriously during the Class Period and acted consistent the minimum fiduciary standards of care and the instructions of the Plan's IPS, they would have, upon observing the underperformance of the BlackRock TDFs relative to the TDF universe and specific readily investable peers, replaced the BlackRock TDFs with a suitable alternative TDF suite.  The Committee's failure to do so caused Plan participants to miss out on substantial investment returns for their retirement savings.

## V.      ERISA'S FIDUCIARY STANDARDS

72.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  Section 404(a) of ERISA, 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> > (A)   for the exclusive purpose of
> >
> > > (i)   providing benefits to participants and their beneficiaries; and
> > >
> > > (ii)   defraying   reasonable   expenses   of administering the plan;
> >
> > [and]
> >
> > (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

73.   Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in a plan and their beneficiaries and defraying reasonable expenses of administering the plan.

74.   Under ERISA, parties that exercise any authority or control over plan assets, including the selection of plan investments and service providers, are fiduciaries and must act prudently and solely in the interest of participants in a plan.

75.   ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982).

76.   ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. Section 405(a) of ERISA, 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. ERISA states, in relevant part, as follows:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)    if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

77.    Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109.  Section 409(a) of ERISA provides, in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## VI.    CLASS ALLEGATIONS

78.    This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed Class:

All participants and beneficiaries in the Cisco Systems, Inc. 401(k) Plan at any time on or after July 29, 2016 and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just, including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

79.　　This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

80.　　**Numerosity**.  Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

81.　　**Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)　　Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)　　Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)　　Whether and what form of relief should be afforded to Plaintiffs and the Class.

82.　　**Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical of all the members of the Class.  Plaintiffs' claims and all the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.  In addition, Plaintiffs seek relief for the Plan under the same remedial theories that are applicable as to all other members of the Class.

83.　　**Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with other members of the Class or interests that are any different from the other members of the Class.

Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

84. **<u>Potential Risks and Effects of Separate Actions</u>**.  The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

85. **<u>Predominance</u>**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

86. **<u>Superiority</u>**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

87.    **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

88.    Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

89.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

90.    Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

**COUNT I**
**(For Breach of Fiduciary Duty)**

91.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

92.    Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses

of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

93.     To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they, or it was a co-fiduciary and knowingly participated in, or concealed, a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their, or its specific responsibilities giving rise to his, her, their, or its fiduciary status, or knowingly failed to cure a breach of fiduciary duty by another fiduciary and failed to take reasonable efforts to remedy the breach.

94.     As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

95.     Pursuant to Sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs, and other recoverable expenses of litigation.

## COUNT II
### (Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)

96.     Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

97.     Cisco is responsible for appointing, overseeing, and removing members of the Committee by and through its Board and the Committee itself.

98.     In light of its appointment and supervisory authority, Cisco and the Board each had a fiduciary responsibility to monitor the performance of the Committee and its members.

99.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

100.     To the extent that fiduciary monitoring responsibilities of Cisco or the Committee was delegated, Defendants' monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

101.     Defendants breached their fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

(b)   Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c)   Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

102.     As a consequence of these breaches of the fiduciary duty to monitor, the Plan

suffered substantial losses.  Had each of the Defendants discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

103.    Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

104.    Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts constituted breaches; enabled the other Defendants to commit breaches by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches.  Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### (In the Alternative, Liability for Knowing Breach of Trust)

105.    Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

106.    In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

107.    To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants

are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of imprudent investment options, all of which was unjustifiable in light of the size and characteristics of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demand judgment against Defendants for the following relief:

(a)     Declaratory and injunctive relief pursuant to Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of Section 502(h) of ERISA, 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

DATED: September 1, 2023                    Respectfully submitted,

/s/ Kolin C. Tang
Kolin C. Tang
MILLER SHAH LLP
3 Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: kctang@millershah.com

James E. Miller
Laurie Rubinow
MILLER SHAH LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
        lrubinow@millershah.com

James C. Shah
Alec J. Berin
John C. Roberts
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
        ajberin@millershah.com
        jcroberts@millershah.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*